UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Dean A. Birkeland, as trustee for the next of kin of John O. Birkeland;

Plaintiff,

vs.

John Edward Jorgenson, Kyle Eckert Joseph Robert Adams, individually and acting in their official capacities as City of Roseville Police Officers; and The City of Roseville;

Defendants.

Civil File No.:__________________

**COMPLAINT**

**Jury Trial Demanded Under Fed. R. Civ. 38(b)**

---

For his complaint, Dean A. Birkeland, as trustee for the heirs and next of kin of John O. Birkeland, states and alleges as follows:

**PRELIMINARY STATEMENT**

1. This is a civil action for damages arising out of the death of John O. Birkeland, who was shot and killed by police in his home on February 10, 2016.

2. Dean A. Birkeland ("Plaintiff") is the natural brother of John O. Birkeland ("Birkeland") and was duly appointed trustee by Order of the District Court of Otter Tail County, State of Minnesota, to prosecute a civil action for the benefit of next of kin of his brother, pursuant to the provisions of the Minnesota Wrongful Death Statute, Minn. Stat. § 573.02(3).

3. This wrongful death action stems from the violation of Birkeland's constitutional rights by on-duty police officers from the City of Roseville, Minnesota: (a) officer John Edward Jorgensen, Badge #159 ("Jorgensen"), (b) officer Kyle Eckert, Badge #212 ("Eckert"), and (c) Sergeant Joseph Robert Adams, Badge #S-25 ("Sgt. Adams" or "Adams") (collectively, the "defendant officers" or the "defendants"). While acting under color of state law, the defendant officer's violated Birkeland's well-settled, clearly-established, federal civil rights.

4. Plaintiff also asserts wrongful death claims against Sgt. Adams, while acting in his supervisory capacity, and against the defendant officers' employer, the City of Roseville, under *Monell v. Dep't of Social Servs.,* 436 U.S. 658 (1978) and *City of Canton v. Harris*, 489 U.S. 378 (1989).

5. Plaintiff, on behalf of Birkeland's next of kin, demands this action be tried to a jury.

## THE PARTIES

6. Plaintiff is a resident of the City of Fergus Falls located in Otter Tail County, State of Minnesota.

7. At all times relevant and material hereto, defendant Jorgensen was a police officer for the City of Roseville Police Department and was acting within the course and scope of his employment with the City of Roseville.

8. At all times relevant and material hereto, defendant Eckert was a police officer for the City of Roseville Police Department and was acting within the course and scope of his employment with the City of Roseville.

9. At all times relevant and material hereto, defendant Sgt. Adams was a police officer for the City of Roseville Police Department and was acting within the course and scope of his employment with the City of Roseville and as a supervisor for the City of Roseville.

10. The defendant City of Roseville ("City") is a municipality, a political subdivision organized under the laws of the State of Minnesota, which includes a police department operated as the Roseville Police Department and located at 2660 Civic Center Drive, Roseville, MN 55113.

11. At all times relevant and material hereto, the City employed the defendant officers and was responsible for their training, supervision and discipline.

12. At all times relevant and material hereto, the defendant officers acted under color of state law and pursuant to their authority as police officers employed by the City.

## JURISDICTION

13. This civil action arises under and is brought pursuant to the Fourth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, as well as Minnesota common law theories of intentional tort liability and Minn. Stat. § 573.02.

14. This Court has subject matter jurisdiction over the parties and the causes of action alleged by the plaintiff pursuant to 28 U.S.C. §§ 1331 and 1343.

15. This Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

16. Venue in this Court is proper in that the defendant officers and the City are located in and conduct business in the State of Minnesota.

## FACTUAL BACKGROUND

17. At times relevant and material herein, Birkeland was a 52-year-old man (DOB 11/12/1963), (DOD 02/10/2016), who lived in apartment #11 ("apt. #11") of the apartment building located at 1610 County Road B West, Roseville, MN 55113 ("apartment building"). Birkeland's home, apt. #11, was located in the southeast corner of the 3rd floor of the apartment building.

18. On February 10, 2016, at 21:55:36 (9:55:36 P.M.), Birkeland's neighbor, Megan Blommer ("Blommer"), telephoned the Roseville Police Department's #911 operator to ask the City to send out an officer to the apartment building for a "welfare check" on the tenant, who lived in apt. #11 next door to her unit (apt. #10). Blommer told the police operator she could hear a man inside apt. #11 screaming and maybe throwing things, because it sounded like things might be breaking. Blommer also told the police operator she could hear banging on the wall between the two apartments. Finally, Blommer told the police operator the tenant in apt. #11 may have mental illness, and this type of disturbance had happened before.

19. At about the same time, Erin Marrone ("Marrone"), who lived in apt. #9 of the apartment building, also telephoned the Roseville Police Department's #911 operator. Marrone told the police operator she was concerned about the man who lived in apt. #11. Marrone told the police operator the tenant was having another verbal outburst inside his apartment. She told the operator he was yelling, perhaps throwing

things and it sounded like breaking glass inside his apartment. Marrone told the police operator in the past the same tenant experienced similar verbal outbursts inside his apartment.

20. The #911 police operators, who took Blommer's and Marrone's calls, told the women the City would have somebody go out there to check.

21. At 22:00:48 (10:00:48 P.M.), the City's police dispatcher sent City police officers, Haivy Vaing, Badge #224 ("Vang"), and Mitch Christensen, Badge #219 ("Christensen"), to check on a reported disturbance at 1610 County Road B West, apt. #11. The police dispatcher instructed officers Vang and Christensen that it was reported that a male inside apt. #11 was "hollering and throwing things around in the apartment" … "looks like the party has some mental health issues" … "and looks like we have been there a few times before also."

22. Upon information and belief, while officers Vang and Christensen were on their way to the apartment building, the officers were informed the "[s]ubject is John Birkeland, he's got a misdemeanor warrant for his arrest … he might not be aware of it … the apartment is at the SE corner of the 3rd floor."

23. At 22:02:36 (10:02:36 P.M.), officers Vang and Christensen each drove up to the apartment building.

24. Officers Vang and Christensen were met at the apartment building's front security door by Blommer and Marrone, who told the police officers Birkeland "lived alone" in apt. #11.

25. Officers Vang and Christensen walked up to the third floor of the apartment building and located apt. #11.

26. When officers Vang and Christensen arrived at the front door of Birkeland's home, officer Christensen was wearing a City-issued body-mounted audio and video camera (the "body cam audio & video").

27. Plaintiff, through counsel and pursuant to the Minnesota Data Practices Act, asked the City to produce a true and correct, non-redacted, unedited, copy of the body cam audio & video for the time period - starting when officer Christensen arrived at the apartment building and ending when he left the apartment building after the shooting.

28. On about December 29, 2016, the City granted plaintiff's request and produced, among other things, a true and correct, non-redacted and unedited copy of the body cam audio & video.

29. The body cam audio & video starts recording the time at the 00:00 mark, showing officers Vang and Christensen standing outside Birkeland's door – apt. #11.

30. From the 00:00 to 00:32 mark, the body cam audio & video shows officers Vang and Christensen standing outside apt. #11 listening intently, but there are no voices, no noises and no other sounds of a commotion coming from the inside of apt. #11. From 00:00 to the 00:32 mark of the body cam audio & video, it is quiet – no sounds are picked up by Christensen's body cam.

31. From the 00:32 to 00:37 mark of the body cam audio & video, the listener can hear Birkeland inside his apartment say what might have been, "Give me my

fucking … please." By the tone of Birkeland's voice, he may have been distraught or upset. After Birkeland made that statement, there was no yelling, no crying, no noise and no commotion of any kind coming from apt. #11.

32. From the 00:37 to 00:46 second mark, the body cam audio & video is silent.

33. At about the 00:40 second mark, officers Vang and Christensen had their handguns at the ready.

34. At the 00:46 mark of the body cam audio & vide, officer Christensen knocked on Birkeland's apartment door.

35. Following officer Christensen's initial knock on the door of apt. #11, Birkeland was silent, and there was no noise or commotion coming from inside apt. #11. Officers Vang and Christensen listened intently at the door of apt. #11.

36. At the 01:06 mark of the body cam audio & video, officer Vang knocked on the door of apt. #11. Vang's knock was followed by silence.

37. At the 01:15 mark of the body cam audio & video, officer Vang shouted, "John, it's the police – open the door."

38. At the 01:18 mark, Birkeland responded to officer Vang in a calm voice saying, "Oh, I am OK."

39. At the 01:20 mark of the body cam audio & video, officer Vang repeated "John, open the door."

40. At the 01:21 mark, Birkeland calmly responded, "No. I am OK."

41. Between the 01:22 and 02:30 marks on the body cam audio & video, officer Vang and Birkeland maintained a fairly steady dialogue, as follows:

(a) Officer Vang said, "John."

(b) Birkeland immediately interjected "No. I am fine."

(c) Vang responded, "Open the door, so we can take a look, and we will be on our way, OK, just open the door, John, your neighbors heard things breaking, we got to make sure you're OK before we can leave."

(d) In a calm manner and clear voice, Birkeland responded to officer Vang, "No, I am fine, I was trying to find something and I found it."

(e) Officer Vang responded, "OK, and we need to make sure of that before we can leave … open the door please."

(f) Birkeland responded, "No, we're good."

(g) Officer Vang said, "John, open the door please."

(h) Birkeland said, "No, I am fine."

(i) Vang responded "John, don't make it harder than it is, OK, open the door, let us take a look, check around and then we are on our way, OK."

(j) Birkeland responded, "No, I am fine, … (unintelligible) … I am trying to find my billfold, and I got robbed … again".

(k) Officer Vang responded, "OK, well we're the police, and we can talk to you about that, can you open the door please."

(l) Vang said, "John!"

(m) Birkeland responded, “Yes.”

(n) Vang said, “My name is officer Vang, open the door, and let’s talk, OK.”

42. At the 02:31 mark of the body cam audio & video, officer Christensen told officer Vang, “He’s saying he was robbed, we got victim of a violent crime.” Officer Vang did not respond to officer Christensen’s comment.

43. From the 02:40 to the 03:39 mark of the body cam audio & video, officer Vang attempted to re-engage Birkeland in conversation - Officer Vang said, “John … John … John … Open your door, I don’t want to have to kick it in … now open your door, let’s talk … John open the door now … John, can you open your door, or we are going to have to kick it open … John we gotta check on you before we can leave, I don’t want to kick open your door … John can you open the door, so we don’t have to do that please… and we can be on our way…” Birkeland did not respond to officer Vang.

44. At the 03:45 mark of the body cam audio & video, officer Vang knocked on the door.

45. At the 03:52 mark, officer Vang said, “John, last chance, I need you to open the door now please… like I said, I don’t want to kick it open, we gotta make sure you’re OK before we can leave.”

46. At the 04:26 mark of the body cam audio & video, officer Vang said, “John, open the door now.”

47. At the 04:44 mark, officer Vang said, “John, we can’t leave until we know you’re OK.”

48. At the 04:51 mark, officer Vang said, "John, can you talk to me, so I know you're OK?"

49. At the 04:55 mark, officer Vang said, "John, can you hear me?"

50. At the 05:04 mark of the body cam audio & video, officer Vang said, "John, we gotta talk and make sure you're OK before we can leave."

51. At the 05:13 mark, officer Vang said, "Can you still hear me John?"

52. At the 05:21 mark of the body cam audio & video, officer Vang said, "John, it's the police, we gotta check on you … can you hear me?"

53. At the 06:14 mark of the body cam audio & video, officer Vang knocked on the door and said, "John," and at the 06:24 mark officer Vang said, "John," then at the 06:29 mark officer Vang knocked on the door; at the 06:24 mark, Vang said, "John", and then at the 06: 29 mark, officer Vang knocked on the door and said, "Open your door."

54. At the 06:48 mark of the body cam audio & video, officer Vang spoke into his radio microphone announcing to all listening police officers that "[t]he subject is John Birkeland … he's got a misdemeanor warrant for his arrest … he might not be aware of it … the apartment is at the southeast corner of the third floor … still no verbal contact."

55. At the 06:59 mark, officer Vang said, "John, it is the police … we gotta talk to you … come to the door."

56. At the 07:12 mark of the body cam audio & video, officer Vang said, "John, it is the police, can you hear me," and at the 07:17 mark, officer Vang pounded on the door.

57. At the 07:24 mark of the body cam audio & video, a different police officer at the door said, "John, let us know you are OK … say something, so we know you are alright."

58. At the 07:34 mark, officer Vang said, "John, your door, your door is gonna get kicked in, OK John… that is where we are at right now, OK John."

59. At the 07:59 mark, officer Vang said, "John, you said you got robbed, are you OK … if that is something that happened, that is something we can help you with and that's something we want to hear about … can you tell me about that John."

60. After several minutes of listening intently at the door and communicating from outside apt #11, officers Vang and Christensen concluded that the only person they heard inside apt. #11 was Birkeland. The officers had no indication there was anyone else in apt. #11.

61. At the 08:38 mark of the body cam audio & video, officer Vang knocked on the door and said, "John, open the door."

62. At the 08:57 mark, officer Vang said, "John, it is the police and we're worried about you, we want to make sure you're OK, can you come to the door … talk to me, let me know you're OK … can you hear me John."

63. At the 09:40 mark on the body cam audio & video, officer Vang knocked on the door, and at the 09:48 mark, he said, "John, I need you to come to the door please."

64. At the 10:00 minute mark of the body cam audio & video, officer Vang knocked on the door and said, "John, let me know you're OK … can you hear me John?"

65. At the 10:14 minute mark on the body cam audio & video, Sgt. Adams, who was also in the hallway outside apt. #11 said to officers Vang and Christensen, "Alright, so is he … DK(?) (unintelligible)?" Officer Vang whispered to Sgt. Adams, "that's what it sounds like…he was crying at first, then he started swearing, and stuff was dropping and falling … I don't know if he is 'DK' … but he … (unintelligible)." Sgt. Adams then said, "Sure…. and what did he say?" Officer Vang responded to Sgt. Adams, "I told … we heard about the noise, and he (Birkeland) said … he was looking for his wallet … (unintelligible) … and something fell." Then, upon the information and belief, Officer Christensen interjected, "he got robbed." Officer Vang then told Sgt. Adams, "And he said he got robbed, and that's when contact got cut off … (unintelligible)." Upon information and belief, "DK" means intoxicated.

66. At the 11:37 minute mark, officer Vang knocked on the door and said, "John, it's the police, we gotta check on you before we can leave, can you tell me you are OK?"

67. At the 11:55 mark, officer Vang said, "John it is the Roseville Police Department, we gotta know you're OK … can you talk to me John, we're not leaving."

68. At the 13:02 mark, officer Vang said, "John, this is the police, open your door … we need to check on you to see if you're OK John."

69. At the 15:12 mark of the body cam audio & video, officer Vang said, "John, this is the police department, open your door… we just need to check on you to see if you're OK, John."

70. At the 15:42 mark, officer Vang said, "Hey John, this is officer Vang, we're here to help you, open your door … let us help you and then we're on our way."

71. At the 17:42 mark of the body cam audio & video, a different officer was standing at the door of apt. #11. Upon information and belief, that officer was Sgt. Adams, and he yelled, "John, this is the police department … come to the door."

72. At the 17:57 mark of the body cam audio & video, a police officer, upon information and belief, Sgt. Adams can be heard telling other police officers in the hallway outside apt. #11, "We'll be forcing entry here." At about the 17:57 minute mark, defendant Sgt. Adams made the decision to force entry into Birkeland's home.

73. At the 18:20 minute mark of the body cam audio & video, defendant Sgt. Adams used "the ramp" (a battering ram) to break down the door of apt. #11, to facilitate the forcible entry of Birkeland's home.

74. With apt. #11's door smashed open, starting at the 18:30 minute mark and continuing through the 21:20 mark of the body cam audio & video, officer Vang repeatedly yelled, "John, this is the police department … John, this is the police department John, …If you can hear me, come towards the door with your hands up John…John, this is the police, if you can hear my voice, come towards the door with

your hands up … John, this is the police department … if you can hear my voice come to the door with your hands up, so we can see your hands … John, this is the police … John, this is the police … if you can hear me, come towards the door with your hands up…John, this is the police … if you can hear my voice, come towards the door with your hands up…we need to see that you are OK, John … John, this is the police, if you can hear my voice come towards the door with your hands up… we need to see if you are OK John… John, this is the police … You are under arrest."

75. At the 21:21 mark of the body cam audio & video, the City's police officers changed their reason or purpose for being at apt. #11. No longer did the City's police officers consider their purpose for being at Birkeland's home "to perform a welfare check," pursuant to a "community caretaker" function.

76. At the 21:21 mark of the body cam audio & video, the City's police officers, pursuant to the direction and supervision of defendant Sgt. Adams, announced they were there to arrest Birkeland.

77. At the 21:21 mark, officer Vang announced, "John, you are under arrest, we have a warrant for your arrest… if you can hear my voice, come towards the door with your hands up John."

78. At the 21:46 mark of the body cam audio & video, officer Vang said, "John, this is the police, you're under arrest, we have a warrant … if you can hear my voice come towards the door with your hands up."

79. At the time police forced entry into Birkeland's home, they knew he had a bench warrant issued for failure to appear on a misdemeanor citation. That charge arose

on December 16, 2015, when Birkeland was walking near an entrance to the Rosedale Mall in Roseville, MN. Birkeland tripped or stumbled and fell, possibly hitting his head. Birkeland got up from the pavement and started to walk away. A City police officer, who was on routine patrol in the area, heard mall security radio chatter about the fall incident and observed Birkeland walking across the mall's parking lot. The City's officer stopped Birkeland and asked him for ID and whether he needed medical attention. Birkeland refused medical attention. The officer detained Birkeland on suspicion of "public intoxication," which is not against Minnesota law. When the City officer demanded his name, Birkeland purportedly told the City police officer his name was "John O. Brikeland." The City's officer ran that name and determined the individual's actual name was John O. Birkeland and *not* John O. Brikeland. The City's police officer issued Birkeland a citation for "Giving A False Name To A Peace Officer," a misdemeanor, arrested him, and transported him to the law enforcement center for booking. On January 21, 2016, Birkeland was to have appeared in Ramsey County District Court for the misdemeanor citation. He did not appear, and, upon information and belief, the Court issued a non-night capped warrant from the bench for Birkeland's arrest on the misdemeanor.

80. When the defendant officer broke down Birkeland's door and announced that he was under arrest, the defendants knew and understood the nature of the underlying misdemeanor offense and the underlying nature of the non-night capped, misdemeanor arrest warrant.

81. At the 22:00 minute mark of the body cam audio and video, defendant Sgt. Adams got officer Vang out of the apartment door and inserted defendant Jorgensen, a City K9-officer with police dog "Otis" as the contact or communicator between City police officers and Birkeland.

82. Police dog Otis is a male, Belgian Malinois, *aka* Belgian Shepherd, a breed of dog known to bite readily and to have tremendous bite strength, one of the strongest bites of all canine breeds. Otis was trained to target certain areas of a suspect's body to bite, to bite deep, and to hold the bite until commanded to release the bite hold by his handler, defendant Jorgensen.

83. At the 22:04 minute mark of the body cam audio & video on Sgt. Adams direct order, defendant Jorgenson moved the police dog into position at the threshold of the entry to Birkeland's home.

84. When defendant Jorgensen and the police dog took up their position in the doorway of apt. #11, there were about seven (7) City police officers positioned in the hallway around the open door to apt. #11: (a) officer Vang; (b) officer Christensen; (c) officer Juan Toran, Badge #215; (d) officer Ryan Weber, Badge #217; (e) defendant Eckert; (f) defendant Jorgensen and (g) defendant Sgt. Adams.

85. Starting at the 22:07 mark of the body cam audio & video and continuing through the 22:59 minute mark, while positioned at threshold of Birkeland's apartment, defendant Jorgensen, yelled, "Roseville police K9 … John come to the door … John, come to the door now or we're going to send the dog in … the dog will find you and bite you… John, this is the Roseville police K9 unit, come to the door now with your hands

up…the dog is going to be sent into your apartment, he will find you and bite you… John, this is the Roseville police K9 unit… there is a police K9 dog here … he is going to search the apartment … he will find you and bite you…if you can't come to the door, you need to sound off by voice, and let us know where you are… John, you are under arrest."

86. At the 23:01 minute mark of the body cam audio & video, defendant Jorgensen and the police dog along with the other six City police officers entered Birkeland's home with guns drawn to search for and arrest Birkeland in his home pursuant to the non-night capped misdemeanor warrant.

87. Initially, officers Vang and Christensen arrived at the apartment house at 10:02:35 P.M. The defendant officers, as well as other City police officers forced entry of Birkeland's home at the 23:01 minute mark of the body cam audio & video. The body cam was not recording time until officers Vang and Christensen were standing and listening outside apt. #11. Hence, the defendants forcibly entered Birkeland's home sometime after 10:25:37 P.M. on Wednesday, February 10, 2016.

88. At the moment, the defendants forced their way into Birkeland's home to affect a search and seizure pursuant to a non-night capped misdemeanor arrest warrant, they knew and understood under Minn. Stat. §629.31, "[a]n arrest for a misdemeanor may not be made between 10:00 PM. and 8:00 A.M."

89. At the moment, the defendants forced entry of Birkeland's home after 10:25 P.M. on Wednesday, February 10, 2016, they knew and understood their conduct

was in violation of Minn. Stat. §629.31 and on that basis constituted an unlawful, forcible entry into Birkeland's home.

90. At the moment, the defendants forced entry of Birkeland's home, for the expressed purpose to search the home and to arrest Birkeland, they knew and understood they were doing so without the benefit of Birkeland's consent nor pursuant to a valid warrant supported by probable cause. When defendants entered Birkeland's home, they knew and understood their conduct was presumptively unreasonable.

91. At the moment, the defendants forced entry of Birkeland's home, the lives of the City's police officers and other members of the public (other tenants of the apartment building) were *not* in jeopardy.

92. At the moment, the defendants forced their way into Birkeland's home, there was *not* a reasonable basis to conclude there was a pressing or exigent need to engage in a search and seizure *immediately* due to an emergency where Birkeland's life was at risk.

93. Before City police officers entered apt. #11, they were at the door for more than 23 minutes. For most of that time, approximately 20 minutes, Birkeland ignored the City's police officers' verbal commands.

94. During all times before the defendants forced entry, Birkeland's failure to comply with the City's officers' verbal commands, or his indifference to their verbal commands, amounted to passive resistance to the City police. Birkeland's passive resistance did not involve the use of any physical force against any City officer.

Birkeland's passive resistance did not necessitate the use of a police dog to "bite and hold" him. At the most, Birkeland was a "passive resister."

95. At the moment, defendant Jorgensen and Sgt. Adams sent in the police dog, Birkeland was suspected of a non-violent, minor crime – giving a police officer the name "Brikeland" instead of Birkeland.

96. Birkeland's failure to obey the City officers' verbal commands was a form of passive resistance. At the moment the defendants sent in the police dog, Birkeland did not pose an immediate threat to the safety of the City's police officers or to other tenants in the apartment building. Birkeland was not actively resisting arrest or attempting to evade arrest by flight from his home. Apt. #11 was on the third floor of the apartment building. The door that the defendants broke down was the only way in or way out of apt. #11. Apt. #11 did not have a balcony.

97. Defendant Jorgensen's and defendant Sgt. Adams' decision to send in the police dog with the command to find Birkeland, to bite Birkeland and to hold the bite was intentional, reckless and, given the particular facts of this situation, was objectively unreasonable.

98. Further, defendant Jorgensen and defendant Sgt. Adams knew and understood that deliberately sending the police dog into apt. #11 under the command to "bite and hold" would result in a serious personal injury to Birkeland.

99. At the moment defendants sent in the police dog, they knew and understood a police dog must be used by police officers as a defensive tool or defensive

weapon. Nevertheless, defendants deliberately used the police dog with the bite and hold command or maneuver as an offensive weapon.

100. At the 23:06 mark of the body cam audio & video, defendant Jorgensen and the police dog entered apt. #11. Apt. #11 consisted of a living room, kitchen area, bathroom and one bedroom.

101. At the 24:12 mark of the body cam audio & video, the police dog located Birkeland in the bedroom closet. The bedroom light was turned on. The bedroom's closet had two sliding doors that were both closed.

102. At the 24:14 minute mark, defendant Jorgensen and defendant Eckert were both inside the bedroom standing outside the closed closet with the police dog. Defendant Eckert was providing lethal cover for Jorgensen. Both Jorgensen and Eckert had their 40 caliber semi-automatic handguns in their hands at the ready. Defendant Jorgensen said, "John come out of the closet." Officer Christensen and defendant Sgt. Adams were standing by the doorway at the entrance to the bedroom.

103. At the 24:28 mark of the body cam audio & video, defendant Jorgensen said, "Come out of the closet, you are going to get bit."

104. At the 24:32 mark, defendant Jorgensen said, "John, come out with your hands up, you are under arrest."

105. At about the 24:33 mark of the body cam audio & video, defendant Jorgensen slid the left door of the closet to the right and sent in the police dog in to the closet to bite and hold Birkeland.

106. At the 24:34 mark of the body cam audio & video, defendant Jorgensen announced, "Dog's on, Dog's on."

107. The police dog attacked Birkeland's right knee biting down hard making several linear cuts and around ten (10) puncture wounds on the inside and outside of Birkeland's right knee. Several of the punctures were deep, allowing visualization of the underlying patella bone and the ligaments, tendons and fascia (the connective tissue) of the right knee. Upon information and belief of the plaintiff, when the police dog attacked Birkeland inside the closet, Birkeland was seated on a small cardboard box in the back of his closet.

108. Upon information and belief, when Birkeland retreated to his bedroom closet, he took a kitchen knife with him.

109. After his death, an autopsy revealed multiple, thin linear cuts or abrasions on anterior aspects of his left and right wrists, which, upon information and belief of the plaintiff, were self inflicted by Birkeland using the kitchen knife he had with him.

110. After the police dog attacked Birkeland, biting and holding onto Birkeland's right knee, Birkeland had a right to defend himself against the objectively unreasonable force used by defendants.

111. In self defense, while the dog was biting and holding onto his right knee, Birkeland stabbed once at the dog, causing a 1.5 – 2cm puncture wound at the left side of the dog's face below the lower part of the dog's jaw.

112. At the 24:40 or 24:41 mark of the body cam audio & video, the listener can hear the police dog "Yelp."

113. At the 24:42-43 mark of the body cam audio & video, defendant Jorgensen and defendant Eckert fired their weapons four times (Jorgensen fired three shots and Eckert fired one time), killing Birkeland where he sat in the back of the closet.

114. Birkeland was hit twice in the chest and once in the neck. One bullet missed Birkeland went into the back wall of the closet.

115. Upon information and belief, defendant Jorgensen and defendant Eckert killed Birkeland in defense of the police dog.

116. As a direct result of the defendants' intentional, wrongful, culpable conduct, Birkeland's next of kin have suffered pecuniary loss, including but not limited to funeral expenses, and loss of relationship, aid, counsel, guidance, advice, assistance, protection and support.

117. Plaintiff, Dean A. Birkeland has lost his brother.

118. Arlen Birkeland has lost his son.

119. Richard Birkeland has lost his brother.

120. Ruth Ann Haugen has lost her brother.

121. Donna Ballard has lost her brother.

122. Diane Malkovich has lost her brother.

123. Sandy Danielson has lost her brother.

124. Barb Halvorson has lost her brother.

125. Carla Tice has lost her brother.

126. Despite the evidence in the record of the defendants' objectively unreasonable use of a police dog bite and hold maneuver coupled with the use of deadly

force in defense of the police dog, the defendant City police chief, upon information and belief, appears to have taken the position that the defendant officers, each defendant individually and acting together followed proper protocol, procedures and City policies. After the shooting, the police chief was quoted in the news saying that the bench warrant played a role in the defendant officers' forced entry, indicating it is the City's policy to force entry of an individual's home to make an arrest on a misdemeanor warrant in violation of Minn. Stat. § 629.31

127. Upon information and belief, the City was content not to make any legitimate inquiry into the unlawful entry of Birkeland's home by defendant officers, the objectively unreasonable application of a police dog bite and hold maneuver by defendant Jorgensen and Sgt. Adams, and the unlawful deadly force executed by the defendant officers Jorgensen and Eckert.

128. The defendant officers' conduct was done willfully, callously and with reckless indifference to or actual malice regarding the life, rights and safety of Birkeland and has no place in civilized society.

129. Birkeland's death was the direct result of the defendant officers' illegal entry of Birkeland's home coupled with the objectively unreasonable use of force (police dog bite & hold maneuver) coupled with the unjustified use of deadly force in defense of the police dog.

130. Plaintiff demands a jury trial to all issues of fact herein.

## COUNT I.

### 42 U.S.C. § 1983- Fourth Amendment Violations

131. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

132. By the actions described above, the defendant officers, under color of state law, violated and deprived Birkeland of his clearly established and well-settled civil rights, including but not limited to, (a) the right to be free from unreasonable searches and seizures; (b) the right to be free from excessive force, objectively unreasonable force, and deadly force by persons acting under color of state law in violation of the Fourth Amendment.

133. There was no rational or reasonable basis for the use of the police dog bite and hold maneuver and the use of deadly force in defense of the police dog. The force and violence used against Birkeland was unjustified and excessive.

134. The conduct and force used by the defendants against Birkeland was objectively unreasonable in light of the then existing facts and circumstances as judged by a reasonable police officer at the scene on February 10, 2016.

135. Defendants' individual and joint conduct was objectively unreasonable, and the unlawfulness of their actions or omissions was apparent in light of clearly established law.

136. Birkeland died as a direct and proximate result of the defendant officers' acts and omissions, and the defendant officers are therefore liable in an amount to be determined.

137. Plaintiff is entitled to recover Birkeland's compensatory damages, including burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

138. Plaintiff and the other next of kin have suffered pecuniary loss, including funeral expenses, loss of relationship, aid, counsel, guidance, advice, assistance, protection and support.

139. Plaintiff is entitled to recovery of his costs, including reasonable attorney fees under 42 U.S.C. § 1988.

140. The defendant officers subjected Birkeland to these deprivations of his rights in such a manner so as to render them liable for punitive damages.

## **COUNT II.**

### **Punitive Damages Under Federal Law**

141. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

142. All of the aforementioned acts, errors and omissions of the defendant officers were willful, malicious, oppressive and were committed in bad faith and with reckless disregard for and deliberate indifference to the rights and safety of Birkeland, so as to subject the defendants to punitive damages pursuant to the statutes and common law of the United States of America.

143. Punitive damages are available against the defendant officers and are hereby claimed as a matter of federal common law under *Smith v. Wade,* 461 U.S. 30

(1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. Ann. § 549.20.

144. Plaintiff is entitled to punitive damages in an amount exceeding Two Million ($2,000,000) Dollars.

## COUNT III.

### Failure To Train Under *City of Canton v. Harris*

145. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

146. Before February 10, 2016, the defendant City with deliberate indifference to the rights of citizens failed to properly train Roseville Police Department police officers or, alternatively, failed to require adherence to appropriate policies to avoid the objectively unreasonable forcible entry of Birkeland's home; the unlawful search and seizure; the unreasonable use of a police dog bite and hold maneuver and the use of deadly force in the defense of a police dog.

147. Through the City's ratification and approval of the defendant officers' intentional and culpable actions, and by failing to discipline the defendant officers, there has been an approval of a deficient policy, custom, or practice of using a police dog bite and hold maneuver in an objective unreasonable manner and deadly force to defend a police dog.

148. Birkeland's wrongful death and the violation of his civil rights were directly and proximately caused by the aforementioned acts and omissions and by the City's failure to train, and the City is thereby liable in an amount as yet to be determined.

149. Plaintiff is entitled to recover Birkeland's compensatory damages, including burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

150. Birkeland's next of kin have suffered pecuniary loss, including but not limited to funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

151. Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT IV.**

**Civil Rights Violations – *Monell v. Dep't of Soc. Servs.***

152. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

153. Before February 10, 2016, the City, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its police officers, including the defendant officers herein, of improperly using a police dog bite and hold maneuver and the use of deadly force to defend a police dog.

154. Through the City's ratification and approval of the defendant officers' actions and by failing to discipline the defendant officers, there has been an approval of a deficient policy, custom, or practice of improperly using a police dog bite and hold maneuver and deadly force to defend a dog.

155. Birkeland's wrongful death and the violation of his civil rights was directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices, and the City is thereby liable in an amount as yet to be determined.

156. Plaintiff is entitled to recover Birkeland's compensatory damages, including burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

157. Birkeland's next of kin have also suffered pecuniary loss, including but not limited to funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

158. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT V.

### Assault

159. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

160. Birkeland was a reasonable person.

161. The conduct of defendant Jorgensen described in detail and alleged in this complaint shows the defendant acting individually and in concert at times on February 10, 2016, at Birkeland's home to intentionally create in Birkeland's mind an apprehension of immediate physical harm by means of overt actions and gestures constituting assault. The defendant yelled, the police dog "will find you and will bite

you," … "Come out of the closet, you are going to get bit," and by releasing the police dog and ordering it to attack Birkeland, while Birkeland was seated on a box in the back of his bedroom closet and was not actively resisting the defendant officer, attempting to flee from the officer or presenting a risk to the safety of officer or others. Defendant's actions were intended to create in Birkeland's mind a reasonable apprehension of an immediate battery. The defendant's intentional conduct constitutes assault.

162. As a direct and proximate result of defendant's intentional and culpable conduct, Birkeland suffered a reasonable apprehension of an immediate battery, immediate harm and, of course, Birkeland's reasonable fear was realized when defendant Jorgensen ordered the police dog bite and hold maneuver. The City's police dog Otis had been trained to inflict serious personal injuries, and it did its job.

163. As a direct and proximate result of defendant's intentional and culpable conduct, plaintiff is entitled to judgment against defendant in a reasonable amount as yet to be determined, pecuniary loss, including but not limited to funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

**COUNT VI.**

**Battery**

164. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

165. Defendants Jorgensen and Eckert battered Birkeland. Without the consent of Birkeland, defendants intentionally, harmfully and offensively touched Birkeland, by forcibly entering Birkeland's home, to use an objectively unreasonable police dog bite

and hold maneuver followed by the use of deadly force in defense of the police dog, shooting Birkeland two times in the chest and one time in the neck causing Birkeland's unjustified and wrongful death as he sat in the back of his bedroom closet with the police dog holding a deep bite on his right knee.

166. Defendant officers intentionally caused the unreasonable application of force to Birkeland's person followed by the application of deadly force in defense of the police dog directly and proximately causing the wrongful death of Birkeland.

167. For all of the reasons set forth in detail in the above paragraphs, which are incorporated herein by reference, plaintiff is entitled to judgment against defendants in an amount as yet to be determined, pecuniary loss, including by not limited to funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

## COUNT VII.

### Vicarious Liability.

168. Plaintiff realleges and incorporates herein by reference each and every allegation contained in each paragraph above as though fully set forth herein.

169. Defendant City, as an employer, is vicariously liable for the state law torts of its employees, the defendant officers, as described above.

170. As a direct and proximate result of the defendant officers' intentional and culpable conduct, these torts committed by employees of the City while they were acting within the course and scope of their duties as City police officers, Birkeland suffered serious personal injuries and an unjustified, wrongful death. As a direct and proximate

result of the defendant's culpable conduct, plaintiff and the other next of kin have sustained pecuniary losses and damages as described and set forth above.

## COUNT VIII.

### Wrongful Death – Minn. Stat. § 573.02

171. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

172. Defendants' culpable conduct described and set forth in the preceding paragraphs herein are wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

173. Those wrongful acts and omissions directly and proximately caused Birkeland's death.

174. As a direct and proximate result, Birkeland's next of kin have suffered, in an amount as yet to be determined, pecuniary loss, including but not limited to funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff as trustee for the heirs and next of kin of John O. Birkeland prays for judgment against defendants as follows:

1. As to Count I and II, a money judgment in favor of plaintiff and against defendant officers for compensatory damages in an amount to be determined and punitive damages in an amount in excess of Two Million ($2,000,000) Dollars together

with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

2. As to Counts III and IV, a money judgment in favor of plaintiff and against the City of Roseville for compensatory damages in an amount to be determined together with costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and prejudgment interest;

3. As to Counts V, VI and VII, a money judgment in favor of plaintiff and against defendants, and each of them jointly and severally, in an amount yet to be determined but greater than $75,000.

4. As to Count VIII, all damages available under Minn. Stat. Ann. § 573.02, subd. 1 in an amount to be determined together with costs and prejudgment interest;

5. For an Order requiring the imposition of appropriate discipline for defendant officers; and

6. For such other and further relief as this Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims.

Dated: April 11, 2017

**JAMES R. BEHRENBRINKER**
***Attorney at Law***

*s/ James R. Behrenbrinker*
James R. Behrenbrinker
(MN Bar No. #0186739)
412 South Fourth Street
Suite 1050
Minneapolis, MN 55415
*Tel.* (612) 294-2605
*Fax* (612) 294-2640
jbehrenbrinker@comcast.net

**KARIN CIANO LAW PLLC**
Karin Ciano
(MN Bar No. #0343109)
310 Fourth Avenue South, Suite 5010
Minneapolis, MN 55415
*Tel*. 612-367-7135
*Fax* 612-437-4440
karin@karincianolaw.com

**Attorneys for Plaintiff**