## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dean A. Birkeland, as trustee for
the next of kin of John O. Birkeland,

                Plaintiff,

v.

John Edward Jorgenson,[1] individually and
acting in his official capacity as a City
of Roseville Police Officer; Kyle Eckert,
individually and acting in his official
capacity as a City of Roseville Police
Officer; John Robert Adams, individually and
acting in his official capacity as a City
of Roseville Police Officer; and the City of
Roseville,

                Defendants.

Civil No. 17-1149 (DWF/LIB)

**MEMORANDUM
OPINION AND ORDER**

---

James R. Behrenbrinker, Esq., Behrenbrinker Law Firm; and Karin Ciano, Esq., Karin
Ciano Law PLLC, counsel for Plaintiff.

Jordan Clark Leitzke, Esq., Joseph E. Flynn, Esq., Patrick S. Collins, Esq., and Vicki A.
Hruby, Esq., Jardine, Logan & O'Brien, counsel for Defendants.

---

## INTRODUCTION

    This matter is before the Court on a Motion for Summary Judgment brought by

Defendants John Edward Jorgensen ("Officer Jorgensen"), Kyle Eckert ("Officer

---

[1]     It appears from the record that the correct spelling of this party's last name is
Jorgensen.

Eckert"), John Robert Adams ("Sergeant Adams"), and the City of Roseville (the "City") (collectively, "Defendants").  (Doc. No. 38.)  For the reasons set forth below, the Court grants in part and denies in part the motion.

## BACKGROUND

Plaintiff Dean A. Birkeland ("Plaintiff") is the brother of John O. Birkeland ("Birkeland") and the trustee for his next-of-kin.  On the night of February 10, 2016, Birkeland was shot and killed by the police after an encounter that the Court details below.

Birkeland was 52 years old and lived alone in a one-bedroom apartment (apartment #11) in Roseville, Minnesota.  At approximately 9:55 p.m. on February 10, 2016, two of Birkeland's neighbors separately called 911 to ask for a welfare check on Birkeland.  (Doc. No. 41 ("Collins Aff.") ¶ 2, Exs. A & B; Collins Aff. ¶ 2, Exs. F (Body Cam Audio) & G (Body Cam Tr.).)[2]  The neighbors reported hearing a man in the apartment screaming, cursing, breaking glass, and throwing things.  They also explained that the tenant might have mental health issues and that this type of thing had happened before.

At approximately 10:00 p.m., the City's dispatcher sent Officers Mitchell Christensen and Haivy Vang to Birkeland's apartment for a welfare check on a reported

---

[2]     Plaintiff also attaches a transcript of the Body Cam Audio.  (*See* Doc. No. 50 ("Behrenbrinker Decl.") ¶ 3, Ex. 2.)  While there are minor discrepancies between the transcripts, the Court discerns no material differences.  Therefore, for the sake of efficiency, the Court will cite only to the transcript attached to the Collins Affidavit.

disturbance by a male party with possible mental health issues who was hollering and throwing things around his apartment. (Behrenbrinker Decl. ¶ 2, Ex. 1 at 7-8.) The dispatcher noted that "it looks like we have been there a few times before." (*Id.*) As the officers drove to Birkeland's apartment, they also learned that Birkeland had a misdemeanor warrant for his arrest. (*Id.*) There is no dispute that this warrant did not allow for Birkeland's arrest in his home after 10:00 p.m.

Officers Christensen and Vang arrived at the apartment building at 10:02 p.m. Outside the apartment building, the Officers heard loud, crashing noises. (Collins Aff. ¶ 2, Ex. D ("Christensen Dep.") at 75-76.) Later, standing outside Birkland's apartment, they heard a male yelling, crying, and swearing in an angry tone. (*Id.* at 77-78; Collins Aff. ¶ 2, Ex. E ("Vang Dep.") at 25-26.) At the door to Birkeland's apartment, Officer Christensen began recording with his body camera. For 30 seconds, there is silence, followed by Birkeland saying "Give me my fucking . . . please. Please." (Body Cam Tr.) This was followed by more silence. Both Officers Vang and Christensen knocked loudly with no response. Officer Christensen yelled, "John, it's the police, open the door." (*Id.*) Seconds later, Birkeland answered, "Oh, I am OK." (*Id.*) Officer Vang repeated, "John, open the door." (*Id.*) Birkeland responded, "No, I am OK." (*Id.*) This dialogue followed:

| Vang: | John-- |
|---|---|
| Birkeland: | No, I'm fine. |
| Vang: | Open the door so we can take a look and then we'll be on our way. OK? Just open the door. |

| | |
|---|---|
| Christensen: | John, your neighbors heard things breaking, we gotta make sure you're okay before we can leave. |
| Birkeland: | No, I am fine. I was trying to find something and I found it. |
| Christensen: | Okay. And we need to make sure of that before we can leave. Open the door, please. |
| Birkeland: | No. You're—you're good. I'm . . . |
| Christensen: | John, open the door, please. |
| Birkeland: | No, I'm fine. |
| Vang: | John, don't make it harder than – than it is, okay? Open the door, let us take a look, check around and then we're on our way. Okay? |
| Birkeland: | No, I am fine. I'm trying to find my billfold and I got robbed. Again. |
| Christensen: | Okay. Well, we're the police, and can we talk to you about that. Can you open the door, please? |
| Vang: | John? |
| Birkeland: | Yes? |
| Officer Vang: | My name is Officer Vang. Open the door and let's talk. Okay? |
| Christensen: | If he's saying he was robbed, we've got a victim of a violent crime. |

(*Id*.) The officers knocked on Birkeland's door again and Officer Vang said: "John. John. John. Open the door. I don't want to have to kick it in, now open your door, let's talk." (*Id*.) Receiving no response from Birkeland, the officers repeated that they would have to kick down the door if Birkeland did not open it.

4

Officer Christensen reported over the police radio that Birkeland was not speaking to them, Birkeland reported being robbed, and indicated that they would be forcing entry into the apartment. Roughly 30 seconds later, Officer Christensen again told Birkeland that they could not leave until they knew he was all right. While still at the front door, the officers continued to try to get Birkeland to speak with them. They were not successful. Over the police radio, Officer Christensen reported that Birkeland had not made further verbal contact and noted that Birkeland had a misdemeanor warrant for his arrest. At one point, Officer Christensen and another officer asked Birkeland to talk to them about his allegation that he had been robbed.

More officers arrived at the scene, including Sergeant Adams. The officers continued to knock and repeatedly ask Birkeland if he was all right. (Body Cam Tr.) Sergeant Adams asked Officers Christensen and Vang, "All right. So he's EDP [an emotionally disturbed person], right?" (*Id.*) Officer Christensen responded, "That's what it sounds like, yeah . . . He was crying at first and then he started swearing and stuff was dropping and falling. I don't know if he's DK [drunk], but he's (inaudible) so." (*Id.*) The officers continued for several minutes to tell Birkeland that they were not leaving, asking that he allow them to check to make sure he was all right, and discussing amongst themselves how to proceed. At one point, Sergeant Adams requests that the officers "stand off that door a little bit" so they could try to get a phone number for Birkeland. (*Id.*) Dispatch eventually noted that the phone numbers they had were old and there was no answer to calls placed.

Eventually, Sergeant Adams authorized forcible entry, and the officers used a battering ram to enter the apartment. (*Id.*) Upon entering, the officers remained near the doorway for about two minutes, repeatedly asking Birkeland to come to the door with his hands up so that they could confirm his well-being. Birkeland did not respond. The officers then told Birkeland he was under arrest and that there was a warrant for his arrest and again asked Birkeland to come to the door with his hands up. Sergeant Adams and Officer Jorgensen, who had a police dog with him, consulted with each other and decided to use the dog to locate Birkeland. (Behrenbrinker Decl. ¶ 5, Ex. 7 at 16.) With the dog barking, Officer Jorgensen commanded: "Roseville police K-9. John, open the door. John open the door now or I'm going to send the dog in. The dog will find you and bite you." (Body Cam Tr.) Officer Jorgensen repeated the warning two more times.

Officer Jorgensen told Birkeland that he was under arrest and soon after requested cover as he proceeded to check and clear the rooms of the apartment. Officer Jorgensen commanded the dog, while leashed, to find Birkeland. After clearing the bathroom and the kitchen, the dog entered Birkeland's bedroom and alerted to the closed sliding doors to a closet. The closet was 2'6'' wide and 7'5'' long. (Collins Aff. ¶ 2, Ex. M.) Officer Jorgensen commanded: "Come out of the closet. You are going to get bit." (Ex. G at 16.) Officer Jorgensen then slid open one of the closet doors and observed a person (later identified as Birkeland) crouching in the closet, seated in what Officer Jorgensen describes as a "crouched, ambushed-type position, leaning forward." (Collins Aff. ¶ 2, Ex. I ("Jorgensen Dep.") at 67-68, 93-97.) Officer Jorgensen testified that he could not

tell if there was another person or a weapon in the closet and could not see Birkeland's hands.

Officer Jorgensen notified the other officers that he had made contact with a person, and then pointed his gun at Birkeland and ordered: "[C]ome out with your hands up, you're under arrest." (Body Cam Tr.) Birkeland did not come out of the closet and, instead, moved his right hand behind his back and towards the floor. (Jorgensen Dep. at 68.) Officer Jorgensen feared that Birkeland was reaching for a weapon and that he and the other officers were about to be ambushed. (*Id*.) Birkeland then sent in the police dog to apprehend (or bite) Birkeland. (*Id*.) The dog bit and attached to Birkeland's knee, and Birkeland then produced a knife and used it to stab the police dog in the head. (Compl. ¶ 111; Body Cam Tr.; Jorgensen Dep. at 120.) The dog yelped and tried to reengage while Officer Jorgensen tried to pull the dog out of the closet. (Jorgensen Dep. at 120, 152; Collins Aff. ¶ 2, Ex. L ("Eckert Dep.") at 121.) Officer Jorgensen repeated that he was under arrest and ordered him to put down the knife. (Body Cam Tr.) ("You're under arrest. Let go of that knife! Let go! Let go! Let go!"). Officer Eckert also observed Birkeland facing the officers while gripping the knife. (Eckert Dep. at 121-22.) Officer Jorgensen maintains that Birkeland moved towards, or lunged, in his direction.[3] (Jorgensen Dep. at 152 (testifying that "the individual came out of the closet at me, lunged towards me, from, like, a football-like stance, with a large knife in his hand").) Officer Jorgensen and Officer Eckert fired their weapons. Both Officer Jorgensen and

---

[3] The parties dispute whether Birkeland came out of the closet on his own accord or if he was being pulled out by the dog.

Officer Eckert testified that they feared for their safety and the safety of other officers. (Jorgensen Dep. at 135, 152; Eckert Dep. at 134.)  The other officers came to the room, removed Birkeland from the closet, and began CPR.  Birkeland died from his injuries.

Plaintiff asserts the following claims:  (1) Fourth Amendment Violations pursuant to 42 U.S.C. § 1983; (2) Punitive Damages; (3) Failure to Train; (4) Civil Rights Violations under *Monell v Dep't of Social Servs.*, 436 U.S. 658 (1978); (5) Assault; (6) Battery; (7) Vicarious Liability; and (8) Wrongful Death.  (Doc. No. 1 ("Compl.").) Defendants move for summary judgment on all claims.

## DISCUSSION

## I.     Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir.1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the

record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Federal Claims

Plaintiff asserts various Federal claims:  unlawful entry, unlawful deployment of a police dog, and unlawful use of deadly force (Count I); punitive damages (Count II); failure to supervise (Count III); and a *Monell* claim (Count IV).

### A.    Qualified Immunity

Defendants assert that they are entitled to qualified immunity on Plaintiff's federal claims.  "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'"  *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (explaining that the doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

To overcome the defense of qualified immunity, a plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the

deprivation of a constitutional or statutory right; and (2) that the right was clearly established at the time of the deprivation. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted).[4]  For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "Clearly established" law cannot be demonstrated at a high level of generality; rather, it must put officers on "fair notice." *Sheehan*, 135 S. Ct. at 1777.  Government officials are personally liable only for their own misconduct. *Parrish*, 594 F.3d at 1001.  Thus, "[t]he doctrine of qualified immunity requires an individualized analysis of each officer's alleged conduct." *Walton v. Dawson*, 752 F.3d 1109, 1125 (8th Cir. 2014) (citation omitted).

### B.    Wrongful Entry

Plaintiff alleges that Defendants violated Birkeland's Fourth Amendment rights when they entered and searched his apartment.  Defendants argue that they are entitled to qualified immunity on this claim because the entry and search did not constitute a Fourth Amendment violation and, if there was a violation, the right was not clearly established.  In opposition to the present motion, Plaintiff argues that a reasonable jury could find that the officers entered Birkeland's apartment with the purpose of arresting him on a warrant that they knew would not allow for his arrest at the time, making the entry unreasonable.  In addition, Plaintiff argues that a reasonable juror could conclude that the warrantless

---

[4]     The Court has discretion to decide which qualified immunity prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

entry was unreasonable under the community caretaking function. In support, Plaintiff points to evidence in the record showing that the officers knew or had reason to believe that Birkeland lived alone in an apartment, Birkeland had a history of mental health issues, and that Birkeland could have been drunk. In addition, Plaintiff points out that the reported loud noises and crying within the apartment stopped when the officers arrived and began talking to Birkeland, and that the officers waited fifteen to twenty minutes after arriving to enter the apartment, dispelling the assertion that there was an emergency.

There is no factual dispute that the individual officers entered Birkeland's apartment without a warrant. A warrantless search of an individual's home is presumptively unreasonable, subject to only a few exceptions. *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011). While the record demonstrates that there was an outstanding misdemeanor warrant for Birkeland's arrest, Defendants acknowledge that they could not have legally arrested Birkeland on this warrant in his apartment that night. Instead, Defendants submit that they legally entered under their community caretaking function.

The Eighth Circuit has recognized that a "community caretaking" classification may justify non-investigatory searches and seizures in certain, limited situations. *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014). Law enforcement officers may enter a home without a warrant to protect an occupant from imminent injury. *Sheehan*, 135 S. Ct. at 1774-75. The community caretaking function allows police officers to enter a residence without a warrant "where the officer has a reasonable belief that an emergency exists requiring his or her attention." *United States v. Quezada,* 448 F.3d

11

1005, 1007 (8th Cir. 2006).  The "reasonable belief" required under the community caretaker doctrine "is a less exacting standard than probable cause."  *Id.*  A search or seizure under the community caretaking function is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion.  *Harris,* 747 F.3d at 1017.

Here, it is undisputed that the officers were responding to a call that was initiated by two concerned neighbors reporting a disturbance in Birkeland's apartment after hearing the sounds of a man screaming, cursing, and throwing things against the wall. When the officers arrived at the apartment building, they were aware of these reports and heard what sounded like Birkeland pleading with someone ("Give me my fucking . . . please.  Please.").  The officers inquired, speaking through the door, and while Birkeland repeatedly stated that he was "fine" or "okay," he refused repeated requests to open the door and ultimately stopped communicating with the officers altogether.  Birkeland's assurances that he was "fine" were inconsistent with his neighbors' reports and his silence in response to police requests could reasonably have been viewed as concerning to the officers.  In addition, Birkeland told the officers that he had been "robbed."  While there is no evidence that the officers heard a second person in the apartment, considering all the circumstances presented, it was reasonable for the officers to doubt Birkeland's well-being.  Indeed, the officers testified that they did not know whether there was someone else in the apartment with Birkeland.  Birkeland subsequently failed to respond to numerous additional appeals to open the door, warnings, and calls placed by off-site

police personnel to phone numbers associated with Birkeland or his apartment went unanswered.[5]

The Court concludes, based on these facts, that it was reasonable for the officers to be concerned about Birkeland's well-being and to force entry into Birkeland's apartment so that they could visually confirm that Birkeland was not in danger. In addition, the officers' entry was tailored to the task of finding Birkeland. There is no dispute that the officers announced their presence, asked Birkeland to open the door numerous times, announced when they were going to force entry, entered, warned that they were using a police dog, and then cleared the apartment as they looked for Birkeland. When the officers located Birkeland—in the closet—they stopped searching. There is no evidence that the officers searched anything (such as going through drawers, etc.) that was not directly relevant to locating Birkeland. Viewing the facts in the light most favorable to Plaintiff, the Court concludes that the entry in the apartment did not violate Birkeland's constitutional rights. Based on the circumstances confronting them, the entry was reasonable. Therefore, the officers are entitled to qualified immunity on this claim.

C.    **Excessive Force**

Plaintiff asserts claims for the unreasonable use of a canine and the unlawful use of deadly force, both of which are analyzed under the Fourth Amendment's prohibition of excessive force. The Fourth Amendment prohibits unreasonable seizures, which

---

[5]    Plaintiff contends that the phone numbers were outdated. Even so, the inability to reach Birkeland by phone formed part of the basis of the officers' decision to enter the apartment to confirm that Birkeland was all right.

encompasses the use of excessive force.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).

When evaluating claims of excessive force in Fourth Amendment contexts, courts use an

objective-reasonableness standard.  *Id.* at 397.  In determining whether an application of

force was reasonable, a court balances the nature of the intrusion on the individual's

rights against the governmental interest at stake.  *Id.*  Reasonableness must be judged

from the perspective of a reasonable officer at the time, not with the benefit of "the 20/20

vision of hindsight."  *Id.* at 396.  Ultimately, the question the Court must answer is

"whether the totality of the circumstances" justifies the use of force.  *Tennessee v.

Garner*, 471 U.S. 1, 9 (1985).  The Court evaluates the facts and circumstances

surrounding the use of force, including the severity of any crime at issue, whether the

person poses an immediate threat to the safety of the officers or others, and whether the

person resisted arrest or attempted to evade arrest.  *Samuelson v. City of New Ulm,* 455

F.3d 871, 875 (8th Cir. 2006).  This inquiry is objective, "without regard to [each

officer's] underlying intent or motivation."  *Id*. at 875-76 (citing *Graham*, 490 U.S. at

397).

## 1.     Use of Canine

Excessive force claims involving police dogs are governed by the reasonableness

standard under *Graham*.  *See Kuha v. City of Minnetonka*, 365 F.3d 590, 598 (8th Cir.

2003), abrogated on other grounds by *Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th

Cir. 2007) (en banc).  Plaintiff argues that the deployment of a police dog in the context

of a welfare check involving a man in a one-bedroom apartment was objectively

unreasonable.  Plaintiff points to evidence that Birkeland was in his home and was not

suspected of having committed a crime.  Plaintiff further argues that a reasonable juror could conclude that Birkeland was not fleeing or actively resisting arrest, but rather that he was retreating into his bedroom to avoid being bitten by a dog.  Under these circumstances, Plaintiff submits that a reasonable juror could similarly conclude that the use of the police dog was unreasonable.

Defendants argue that the deployment of the police was objectively reasonable. Defendants point out that each deployment (deploying the dog into the apartment and, later, into the closet) was preceded with separate warnings.  Defendants further submit that Officer Jorgensen had reason to believe that Birkeland resisted numerous commands, was actively fleeing, and posed an immediate threat to his safety and the safety of other officers.  Defendants submit that when Officer Jorgensen discovered a person in the closet (who turned out to be Birkeland), the person was in a crouched position facing an unopened closet door, that Birkeland was less than 7'5'' away from Officer Jorgensen at this point, and that Officer Jorgensen could not see if Birkeland was alone or if there were weapons in the closet.  When Officer Jorgensen ordered Birkeland to "come out with your hands up, you're under arrest," Birkeland did not comply and, according to Officer Jorgensen, moved his right hand behind his back and toward the floor in the closet.  Officer Jorgensen maintains that he was afraid that Birkeland was reaching for a weapon, and thus decided to deploy the police dog to apprehend Birkeland.

The record clearly demonstrates that Birkeland ignored the officers' commands that he present himself to the officers, hid from the officers, and later refused to come out of the closet and put his hands up when the officers discovered him hiding.  In addition,

15

Defendants have submitted evidence that Birkeland moved his hand in a reaching motion despite warnings to put his hands up. However, other facts are relevant to the Court's analysis. For example, the police were in Birkeland's apartment, a confined space with limited areas to for a person to hide. This fact distinguishes this case from several cases cited by Defendants where police dogs were used to locate suspects fleeing outside. *Cf. Kuha*, 365 F.3d at 599-600 (holding that a jury could find the use of a police dog to "bite and hold" a suspect objectively reasonable where the suspect fled the scene of a traffic stop into a swampy area with high grass) *with Chew v. Gates*, 27 F.3d 1432, 1442-43 (9th Cir. 1994) (holding that the reasonableness of the use a police dog is for the jury where, among other things, the suspect was non-violent, completely surrounded and hiding). This is not a case where officers were involved in a hot-pursuit chase of a person suspected of committing a crime. Instead, the officers were called to Birkeland's apartment to conduct a welfare check. The officers were aware that Birkeland had a history of mental health issues, was possibly emotionally disturbed, and could be drunk.

As discussed above, the officers were reasonably concerned about Birkeland's well-being after refusing to open the door and cutting off communication. Therefore, the entry into the apartment was not unreasonable. However, the decision to deploy the police dog is less clear. Importantly, while Defendants claim that Birkeland was resisting and fleeing and that he could have been aggressive or violent, the reasonableness of these beliefs is at issue. Based on evidence in the record, and viewing the facts in the light most favorable to Plaintiff, the Court concludes that a reasonable juror could conclude the deployment of the police dog to locate and bite Birkeland in his apartment was

objectively unreasonable and therefore it could constitute excessive force. However, the Court must also consider the second prong of the qualified immunity analysis, whether the right was "clearly established." To be clearly established, a legal principle must be settled law—clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Hanson v. Best*, 915 F.3d 543, 548 (8th Cir. 2019). To demonstrate that a particular principle is "clearly established," Plaintiff must cite to controlling authority or a "robust consensus of cases of persuasive authority" that places the question "beyond debate." *Id*. Here, Plaintiff has not cited to authority that places the question of the use of the police dog in this situation beyond debate. Therefore, the alleged right at issue is not clearly established, and the officers are entitled to qualified immunity on this claim.

### 2.      Use of Deadly Force

Plaintiff also claims that the use of deadly force on Birkeland was excessive. This claim is also analyzed under *Graham's* reasonableness standard. "The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch v. City of Litchfield,* 689 F.3d 961, 965 (8th Cir. 2012). However, where a person "poses no immediate threat to the officer and no threat to others," deadly force is not justified. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985).

Defendants argue that the use of deadly force was reasonable. First, Defendants argue that by failing to come out of the closet when ordered, stabbing the police dog, failing to drop the knife when commanded, and turning and moving towards the officers

with the knife, the Officers had reason to believe that Birkeland had committed the crimes of obstruction of legal process, felony assault on a police dog, felony assault, and felony terroristic threats. In addition, Defendants assert that Officers Jorgensen and Eckert had a reasonable belief that Birkeland posed a significant risk of death or serious bodily injury to the officers and that Birkeland was actively fleeing and resisting arrest. Finally, Defendants argue that the Court should only scrutinize the seizure itself, and not the allegedly "provoking" tactics (such as entering the apartment and using a police dog) that lead to the seizure.

Plaintiff argues that considering the totality of circumstances, deadly force was not justified as a matter of law. Plaintiff relies on the facts that Birkeland was not suspected of a crime when they entered the apartment and that there was no indication that Birkeland was violent or aggressive. In addition, while Birkeland did tell the Officers that he was looking for his wallet because he had been "robbed," Plaintiff argues that there was no indication that a crime was being committed at that time or that anyone else was in the apartment. Plaintiff also suggests that any belief that a robbery was occurring would have been dispelled when the Officers entered and cleared the apartment, there being no signs that anyone other than Birkeland was present. Plaintiff further submits that Birkeland ultimately used the knife he had in the closet to fend off the biting dog, but maintains that there are fact issues regarding what happened next and, in particular,

whether Birkeland moved in such a way to make the officers reasonably fear for their safety.[6]

The Court concludes that fact issues preclude a determination that, as a matter of law, the use of deadly force was reasonable.  First, the record does not conclusively determine that the officers had a reasonable belief that Birkeland committed the felonies described above.  Second, fact issues remain with respect to whether Birkeland moved towards the officers with the knife so as to create a reasonable belief that Birkeland posed an imminent threat to the safety of the officers or others.  While Officer Jorgensen testified that Birkeland moved, or lunged, towards him with the knife in his hand, the record also contains facts that could suggest to a reasonable juror that Birkeland's movement would not create a reasonable belief of imminent harm.  For example, the record shows that the police dog remained between the officers and Birkeland when the shots were fired.  The dog may have been trying to re-engage by biting Birkeland, and Birkeland's movements may have been impacted by the dog.  In addition, when Officer Eckert peered into the closet, he saw Birkeland (who may have been seated or squatting) in a position such that his upper body was below the clothes hanging in the back of the closet.  (Eckert Dep. at 141.)  The positioning of Birkeland and the layout of the closet, combined with the dog trying to reengage while positioned between the officers and Birkeland, could lead a juror to doubt the reasonableness of the officers' asserted fear for

---

[6]     The Court already explained that a reasonable juror could find that the deployment of the dog was unreasonable.  However, the Court does not consider whether the officers' actions "provoked" the violent confrontation in analyzing whether the use of deadly force was reasonable.  *See, e.g.*, *Schulz v. Long*, 44 F.3d 643, 648-49 (8th Cir. 1995).

their safety.  Viewing these facts in their totality and in the light most favorable to Plaintiff, the Court concludes that a reasonable juror could determine that the use of deadly force against Plaintiff was not objectively reasonable.  In addition, should a jury determine that Birkeland's movement did not create an immediate threat to the officers or others, then the use of deadly force would be contrary to clearly established law.

The primary cases relied on by Defendants are distinguishable.  For example, in *Billingsley v. City of Omaha*, 277 F.3d 990 (8th Cir. 2002), an off-duty police officer witnessed the plaintiff enter a neighbor's house, followed him into the house, and observed him in an upstairs bedroom with a purse in his hand.  *Id*. at 992.  The police officer announced that he was a police officer with his gun drawn and the plaintiff ran past the officer and out the back door onto the deck.  *Id*.  The police officer followed in pursuit and the plaintiff jumped over the deck railing in a crouched position and rotated his left shoulder.  *Id*.  The police officer, who was about fifteen feet away, was unable to see the plaintiff's right hand and then shot the plaintiff, who was later found to be unarmed.  *Id*.  The Eighth Circuit explained that a jury could properly draw the inference of an immediate threat of death or serious bodily injury, so as to make the use of deadly force reasonable, and explained that the "court cannot say no reasonable juror could return a verdict for [the officer.]"  *Id*. at 995.  Unlike here, however, the officer in *Billingsley* witnessed what appeared to be the commission of a crime and was chasing the suspect in hot pursuit.

In addition, in the *Estate of Morgan v. Cook*, 686 F.3d 494 (8th Cir. 2012), officers responded to a report of a domestic disturbance of a man who appeared to be

intoxicated. *Id*. at 495. The man was standing on a porch with no railing and one foot off the ground with the officers standing about six to twelve feet away. *Id*. The man's girlfriend told the officers that the man had a knife and one officer witnessed the man attempting to conceal a kitchen knife in his right hand. *Id*. at 496. An officer drew his gun, pointed it at the man, and ordered him to drop the knife. *Id*. When the man did not drop the knife, but instead lifted his leg as if to take a step in the officer's direction, the officer shot the man. *Id*. The Eighth Circuit affirmed summary judgment in the officer's favor, explaining that the officer's actions were objectively reasonable. *Id.* at 498. As explained above, however, a reasonable juror could conclude that the officers here were not confronted by an individual suspected of a crime or who was clearly moving towards the officers in a threatening way.

### D. Failure to Supervise

Plaintiff claims that the above Constitutional violations were caused by Sergeant Adams' failure to supervise. Because the Court granted summary judgment in favor of Defendants on Plaintiff's illegal entry and search and use of the police dog claims, the only remaining constitutional claim is for the use of deadly force. Plaintiff argues that Sergeant Adams was not physically present, but that he directed officers on the scene and in the room where the allegedly unconstitutional acts occurred.

When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and

(2) was deliberately indifferent to or authorized those acts. *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id*.

Here, Sergeant Adams did not fire his weapon and he did not order Officers Jorgensen and Eckert to shoot Birkeland. In addition, Sergeant Adams was not in the bedroom when Birkeland was shot and could not see the closet area where Birkeland was hiding. On this record, Sergeant Adams cannot be said to have directly participated in the shooting. Therefore, Sergeant Adams is entitled to qualified immunity unless he had notice of prior acts by Officers Jorgensen and Eckert that would constitute a pattern of unconstitutional acts. *See Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997). There is simply no such evidence in the record. Therefore, Sergeant Adams is entitled to qualified immunity on the failure to supervise claim.

### E. *Monell* Claims

Under *Monell*, a municipality is subject to liability under 42 U.S.C. § 1983 only when the violation of the plaintiff's federally protected right can be attributed to the enforcement of a municipal policy. 436 U.S. 658, 694 (1978). Therefore, municipalities cannot be held liable under § 1983, "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Kuha*, 365 F.3d at 603 (quoting *Monell*, 436 U.S. at 691) (overruled on other grounds); *Sitzes v. City of W. Memphis Ark*., 606 F.3d 461, 470 (8th Cir. 2010) (without any underlying constitutional violation, a plaintiff cannot maintain a claim against a local government).

Plaintiff argues that the City's lack of a written policy on welfare checks and failure to train its officers on how to conduct a welfare check or respond to mentally ill citizens proximately caused the above alleged constitutional violations. Plaintiff's *Monell* claim is centered on the alleged lack of policy or training that would have pertained to the decision to enter the apartment (i.e., alleged lack of training on terminating a welfare check prior to entering) and the decision to use the police dog (i.e., how to deploy a police dog into a home). The only aspect of Plaintiff's *Monell* allegations that pertain to the use of deadly force is the alleged lack of training on how to avoid escalating an encounter.

Because the Court found above that fact issues exist with respect to Plaintiff's excessive force claims (use of police dog and deadly force), the Court must also evaluate whether there is an unconstitutional policy or custom that caused harm. To survive summary judgment on a *Monell* claim, Plaintiff must offer evidence sufficient to demonstrate a genuine dispute of material fact as to (1) the existence of a municipal custom or policy (2) that is the "moving force" behind a constitutional violation. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "A 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id*. To sustain a *Monell* claim based on deficient policies regarding training, Plaintiff must show: (1) the City's training practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting its training practices such that its failure reflects a deliberate or conscious choice by the City; and (3) the alleged deficient training procedures actually caused Plaintiff's

23

injuries. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996). Plaintiff "must demonstrate that the [City] had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Parrish*, 594 F.3d at 997-98 (internal quotation marks and citation omitted).

The record does not demonstrate evidence of a widespread policy or custom of unconstitutional use of a canine or of use of deadly force. In addition, Plaintiff has failed to present evidence indicating the City had reason to believe, before the events giving rise to this case, that its training or supervision of the officers was inadequate. Absent some form of notice, the City cannot be deliberately indifferent to the risk that its training or supervision of the officers would result in a violation of a particular constitutional or statutory right. Therefore, the Court finds that no reasonable jury could find the City liable under *Monell* and the City is entitled to summary judgment on this claim.

**F.      Abatement**

Defendants argue that, regardless of the qualified immunity analysis above, Plaintiff's claim are abated by Minnesota's Wrongful Death Statute. In support, Defendants argue that the alleged constitutional violations did not cause Birkeland's death and are appropriately considered personal wrongs that do not survive Birkeland's death. Defendants brief this argument with respect to Plaintiff's claim for wrongful entry and search, relying primarily on *Fernandez v. Virgillo*, Civ. No. 2:12-2475, 2014 WL 828383, at * 4 (D. Ariz. March 4, 2014). In *Fernandez*, the Court found that an unlawful entry claim brought by the parents of their deceased son was abated by Arizona's survival statute because the claim did not survive the death of their son, and that abating an

24

unlawful entry claim after the victim's death did not adversely affect the deterrence goals of § 1983. *Id.* However, because the only alleged constitutional violation for which the officers in this case are not entitled to qualified immunity is that based on the use of deadly force, this argument does not apply. Indeed, the Court in *Fernandez* specifically distinguished the unlawful entry claim with one for excessive force. *Id.* (noting that the "heart of this case is a death that resulted from an officer shooting" and that the unlawful entry claim was not the violation that caused the death). Defendant does not argue that Plaintiff's claims are abated with respect to the deadly force claim. The Court finds that Plaintiff's deadly force claim is not abated.

### G.     Punitive Damages

Plaintiff asserts a claim for punitive damages. Defendants argue that there is no evidence of conduct that would allow such damages.

Punitive damages may be awarded under § 1983 when it is shown that defendant's conduct is motivated by evil motive or intent, or if defendant shows reckless or callous indifference to the federally protected rights of others. *Swipies v. Kofka*, 419 F.3d 709, 718 (8th Cir. 2005); *Schaub v. VonWald*, 638 F.3d 905, 922 (8th Cir. 2011). "Punitive damages punish a defendant for outrageous, intentional, or malicious conduct, and deter similar extreme conduct in the future." *Schaub*, 638 F.3d at 922-23 (citation omitted). The Court concludes that the record does not suggest that either Officer Jorgensen or Officer Eckert acted with reckless or callous indifference to Birkeland's federally-protected rights or that either was motivated by an evil intent. Therefore, the Court grants Defendants summary judgment on the claim for punitive damages. Should

25

evidence presented at trial suggest otherwise, the Court will entertain a motion for reconsideration of the claim.

### III.    State-Law Claims

Plaintiff asserts state-law claims for assault (Count V), battery (Count VI), vicarious liability (Count VII), and wrongful death (Count VIII).

####       A.    Official Immunity

Official immunity shields public officials from state-law claims when their duties require the exercise of discretion, so long as the official has not committed a willful or malicious wrong.  *Pletan v. Gaines,* 494 N.W.2d 38, 40 (Minn. 1992).  Police officers are typically qualified as discretionary officials for the operational decisions made during arrests.  *See, e.g.*, *id.*  To overcome official immunity, Plaintiff must show that the officers acted willfully or maliciously.  *See, e.g.*, *Mumm v. Mornson,* 708 N.W.2d 475, 490 (Minn. 2006).  In the context of official immunity, "malice means . . . the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right."  *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991); *see also Brown v. City of Golden Valley*, 574 F.3d 491, 500-01 (8th Cir. 2009).  In the official immunity context, willful and malicious are synonymous.  *Rico*, 472 N.W.2d at 107.  The question of whether an officer acted willfully or maliciously is usually a question of fact reserved for the jury.  *Brown*, 574 F.3d at 501.

####       B.    Assault, Battery & Wrongful Death

Defendants contend that the doctrine of official immunity protects them from liability on Plaintiff's state-law claims.  As discussed above, Defendants are entitled to

26

qualified immunity on Plaintiff's Fourth Amendment claims insofar as they are based on the officers' entry into Birkeland's apartment and the use of the police dog. The Court concluded that the entry was reasonable and that while a jury could find the use of the canine dog unreasonable and violated Birkeland's constitutional right, that right was not clearly established. Similarly, the Court concludes that no reasonable fact-finder could conclude that the officers' conduct was willful or malicious with respect to the entry into the apartment or the use of the police dog. Therefore, under Minnesota law, Officers Jorgensen and Eckert are entitled to official immunity on those claims.

However, the Court also determined that a reasonable juror could conclude that the the the use of deadly force was unreasonable and that the officers were not entitled to qualified immunity as to that claim. There is no dispute that the officers were using discretion and acted intentionally in shooting Birkeland. The relevant question is whether the officers acted willfully or maliciously. This question is for the jury. Therefore, the Court finds that the officers are not entitled to official immunity insofar as the assault and battery claims are premised on the use of deadly force.

### C.    Vicarious Liability

Official immunity also protects government entities from vicarious liability for actions that are entitled to immunity. *See, e.g., Hayek v. City of St. Paul*, 488 F.3d 1049, 1057 (8th Cir. 2007). Here, the City is entitled to vicarious official immunity as to Plaintiff's state-law claims insofar as they are premised on the officers' entry in the apartment and the use of the police dog.

## CONCLUSION

This case centers on the reasonableness of the use of deadly force. While fact issues remain that preclude summary judgment on that claim and the associated state-law claims, the Court views this as a very close case. Should the jury believe the officers' accounts, namely that Birkeland's behavior and movements created a reasonable belief that Birkeland posed a significant risk of death or serious bodily injury to them or others, then the Court can conceive of a situation where the jury concludes that the use of deadly force was justified. The Court encourages the parties to make a good-faith attempt to settle this case.

## ORDER

Based on the foregoing, and on the files, records, and proceedings, herein, and the Court being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that:

1.     Defendants Motion for Summary Judgment (Doc. No. [38]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a.     The Officers are entitled to qualified immunity on Fourth Amendment claims based on illegal entry and excessive force related to the use of the police dog. Plaintiff's Fourth Amendment claim based on the use of deadly force remains.

   b.     Sergeant Adams is entitled to qualified immunity on Plaintiff's failure to supervise claim.

   c.     The City is entitled to summary judgment on Plaintiff's *Monell* claim.

  d.  Defendants are entitled to summary judgment on Plaintiff's claim for punitive damages.

  e.  Officers Jorgensen and Eckert are entitled to official immunity on Plaintiff's state-law claims insofar as they are based on the entry into the apartment and the deployment of the police dog.

  f.  The City is entitled to vicarious liability on Plaintiff's state-law claims insofar as they are based on the entry into the apartment and the deployment of the police dog.

Dated: May 1, 2019     s/Donovan W. Frank
              DONOVAN W. FRANK
              United States District Judge