UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Dean A. Birkeland, as trustee for the next-of-kin of John O. Birkeland,<br><br>Plaintiff,<br><br>vs.<br><br>John Edward Jorgensen, Kyle Eckert, Joseph Robert Adams, individually and acting in their official capacities as City of Roseville Police Officers; and the City of Roseville,<br><br>Defendants. | File No. 17cv1149 (DWF/LIB)<br><br>St. Paul, Minnesota<br>January 25, 2019<br>9:28 a.m. |

---

BEFORE THE HONORABLE DONOVAN W. FRANK
UNITED STATES DISTRICT COURT JUDGE
**(MOTION HEARING)**

Proceedings recorded by mechanical stenography; transcript produced by computer.

APPEARANCES

For the Plaintiff: Behrenbrinker Law Firm
James Behrenbrinker, Esq.
412 South Fourth Street
Suite 1050
Minneapolis, MN 55415

Karin Ciano Law PLLC
Karin Ciano, Esq.
310 4th Avenue South
Suite 5010
Minneapolis, MN 55415

For the Defendants: Jardine Logan & O'Brien PLLP
Joseph Flynn, Esq.
Patrick Collins, Esq.
8519 Eagle Point Blvd
Suite 100
Lake Elmo, MN 55042

Court Reporter: Lynne M. Krenz, RMR, CRR, CRC
Suite 146
316 North Robert Street
St. Paul, Minnesota 55101

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: I'm sure you'd all rather be outside in the nice warm weather, that's clear.

You're probably lucky you were not here yesterday because, it was in the paper today, this was packed, along with the other courtroom, because the individuals who bombed the mosques were here yesterday. And so we had kind of standing room only.

Why don't we, before we begin, I'll have a couple comments to make.

Why don't we have introductions. We'll start on my right, Counsel's left, and proceed over here after.

MR. COLLINS: Patrick Collins on behalf of the Defendants, Your Honor.

MR. FLYNN: I'm Joe Flynn on behalf of the Defendants, Your Honor.

MR. BEHRENBRINKER: Good morning, Your Honor.

My name is James Behrenbrinker on behalf of the Plaintiffs. And my cocounsel is Karin Ciano. Together we represent the Plaintiff in this case, who's Dean Birkeland, who was a Court-appointed trustee to represent the next of kin of John Birkeland, the deceased.

Also present in the courtroom are Carla Tice, John's brother -- or sister, excuse me. Carla came today

from East Grand Forks, Minnesota.

Next to her is Ruth Ann Haugen and her husband, Craig. Again, Ruth Ann is John's, the decedent's, sister. They came down from Becker, Minnesota.

And, finally, we have Rich -- Richard Birkeland and his wife, Julie. They came over from New Richmond, Wisconsin. Rich Birkeland is John's brother.

The Birkeland family originally had 11 kids. There are 8 surviving brothers and sisters. Not all of them could make it down today, but they're all here in spirit.

THE COURT: All right. Thank you.

I will represent to you that myself, along with one of my lawyer law clerks, have had a chance to read all submissions and most of the cases that respective Counsel have cited.

I would think that it would be a positive thing that obviously this is -- many of these type of cases, even though as all the cases say each Judge should carefully review the specific circumstances of each case, because no two cases are alike when we have a situation like this, but sadly, or otherwise, cases like this come into court with some frequency, sometimes with death resulting, sometimes without, but. So we each hear a fair number of these cases. At least I -- most of us have.

Like in my case, I've been here almost 21 years.

Not too many when I was a state judge for 14 years prior to that, but the --

So I would anticipate filing a decision -- I may telegraph a couple things today, but filing a decision within 60 days or less. And that will probably frustrate one or more people, but, with a memorandum, opinion, and order. And I'll -- I'll talk more about that at the end of the -- at the end of the hearing.

It's always amazing to me, and I find myself saying this at many oral arguments that, nobody in our district is doing it and nobody's going to be doing it, including our two newest judges, but the majority of federal judges now in this circuit and the country for sometime no longer have oral arguments on major motions like this. But we'll leave that for the history books.

And then something fortunately not being affected, because hundreds of people are being affected in this building and across the country is the "partial shutdown." That will have no effect, direct or indirect, on anything happening here in this case at this time.

So with that, we can proceed with oral argument.

MR. COLLINS: May it please the Court, Counsel.

As I introduced myself, my name is Patrick Collins. I am one of the attorneys that represent the

Defendants in this lawsuit, Your Honor.

We are here today pursuant to my client's motion for summary judgment involving the unfortunate death of John Birkeland.

Your Honor, this is a deadly force shooting case.

And the U.S. Supreme Court in the Eighth Circuit Court of Appeals has repeatedly dictated that when analyzing the reasonableness of a deadly force shooting case you analyze the seizure itself, the deadly force shooting, not the events leading up to it.

THE COURT: I have to take exception to that because I've read all the cases you've cited.

And if I ignore the officer's conduct, it's true, there's an objective standard of reasonableness, but if I ignore everything that happened in this case, from the time they got the call to the times they've been to the apartment before, to what was said, the -- before the disputed facts of the closet, or if I would ignore Officer Christensen's formal statement to the Bureau of Criminal Apprehension, compared to his deposition testimony, unlike the case you cite, where two paramedics give handwritten statements in the case that you cited. I believe I'm -- in fact, I think the cases say, to carefully look at all the circumstances.

And, yes, it's clearly an objective standard so, therefore, the motivation of the officers, the subjective

intent of the officers is not the standard.

That's not tantamount to saying, please, Judge, ignore everything that happened prior to the -- the deadly shooting.

And so maybe you can persuade me otherwise, but I -- I think I'm required to look at all the circumstances. There's no dispute about what the law is.

But that's why -- I didn't really mean to interrupt you, but I think, because that is a theme in your brief -- the -- I don't think one of these cases say, Judge, please ignore all the circumstances except those right before the use of deadly force, so, but --

MR. COLLINS: If I may address that, Your Honor?

THE COURT: All right.

MR. COLLINS: I don't think you need to ignore it.

But what the Plaintiffs are asking you to do is find that the entry and the use of the canine were unreasonable for the sole purpose of finding that the use of deadly force was unreasonable. And the case law has specifically said that you can't do that.

THE COURT: Well -- and sorry interrupt you again. But I agree with you that I have an obligation to look separately at the entry into the apartment and then separately the involvement of Otis, the canine dog. And then separately what happened after that.

And, in fact, that wouldn't be the first case where somebody said, well, over the objection of the Plaintiff, that was a perfectly -- under the caretaking community -- caretaking or welfare check exception, the entry into the apartment was legal, but the -- and then separately, whether or not the -- the use of the canine Otis, or the shooting.

I mean, I think, I agree I'm responsible to look at each of those. And it may not be an all or nothing approach here, I have to look at all in evaluating that phrase, objective reasonableness. But sorry to interrupt you again.

MR. COLLINS: No. That's perfectly fine, Your Honor.

And it may be the -- and I believe the Plaintiffs -- and I'm citing from their brief on Page 51 and 52, they specifically say they're not alleging independent or separate claims for unlawful entry or use of the canine.

And so whether or not -- I'm not disputing that you can consider the entry and use of the canine, but it cannot be used to determine whether or not the use of deadly force was reasonable. And I don't believe that's what you're saying.

THE COURT: No. And, of course, we'll find out from the Plaintiffs.

MR. COLLINS: Yes, sir.

THE COURT: Because in terms of that quote that you did --

MR. COLLINS: Yes.

THE COURT: -- because there are separate counts for -- for each of these -- each is probably not the right word, but the chronology of events. Both the entrance into the building, they're specifically alleging that that was a violation of the Fourth Amendment.

And then the -- the -- well, a variety of things, I don't want to oversimplify your position or theirs.

But, yes, I think there are separate counts. I'm obligated to look at all the circumstances but rule on each one, so.

MR. COLLINS: But when the Plaintiffs waive those claims, I don't believe you have to analyze those, Your Honor.

This is -- this is -- they've made it abundantly clear that they're not seeking legal redress for those.

So I understand under the totality of the circumstances you can look at how the officers came in.

THE COURT: Sure.

MR. COLLINS: You can look at what, you know, brought them to the closet. But what it boils down to, this is a deadly force shooting case.

And then when you look at the -- what the officers, the information that they had at the time --

THE COURT: True.

MR. COLLINS: -- based on the totality of their circumstances that they encountered --

THE COURT: True.

MR. COLLINS: -- to determine whether or not the use of deadly force in this case was reasonable.

So I don't believe we're talking a different language, I just think we're just saying it in a different way.

THE COURT: Okay.

MR. COLLINS: But, again, because I believe that I don't believe you're disagreeing with this, that the Eighth Circuit Court of Appeals and the Supreme Court has rejected the provocation argument. That saying that, for example, the entry or the use of a canine, coupled together, created the need for deadly force, because that has been specifically rejected by the Eighth Circuit and U.S. Supreme Court.

In this case, Your Honor, because it is a deadly force shooting case, the issue before the Court is whether the reasonable officers, in Officer Jorgensen and Eckert's position would have considered or would have probable cause to believe that Mr. Birkeland was an imminent threat of

deadly harm or serious deadly harm.

And in our case, Your Honor, the undisputed facts are -- the answer to that question is undisputedly yes. Because it's undisputed that Mr. Birkeland had a butcher knife with him in the closet.

And, obviously, no one disagrees that a butcher's knife can cause serious physical harm to people.

Number two, he used that butcher knife to stab a canine, a police canine in the face, right in front of Officer Jorgensen.

THE COURT: And not suggesting that this is a -- a key issue, but maybe one or both parties will disagree.

But did I understand the -- emphasizing it's -- I don't think it will be an outcome determinative issue today on any issue.

But BCA lab found no blood from Otis, the canine, on that knife?

MR. COLLINS: I don't believe it's -- I believe they -- they couldn't -- the test came back inconclusive.

However, if you take a look at the Plaintiff's brief -- I mean, their complaint, Your Honor, they admit that he did stab the dog. There's -- that's not in dispute.

THE COURT: All right.

MR. COLLINS: They did -- and I've cited in our brief.

THE COURT: All right.

MR. COLLINS: -- they completely admit it. That's not in issue.

THE COURT: All right.

MR. COLLINS: And we show -- we show in our brief that -- the stab wound from the dog with the blood running out of it, with the knife on the floor.

So getting back to the undisputed facts, Your Honor, we also -- so we have him using the butcher knife right in front of Officer Jorgensen on the canine, less than 7 feet, 5 inches away, which is a very short distance.

Then it's undisputed that Mr. Birkeland, after he got done stabbing the dog, turned toward the officer.

THE COURT: Now --

MR. COLLINS: Sure.

THE COURT: Let me ask about that. That's what I was wondering. It takes us back to, I believe, Officer Christensen's statement to the Bureau of Criminal Apprehension where they're saying there's no -- look carefully compare his statement to his depo statement.

And there -- at most, there's a significant disputed issue of fact and whether there was a "lunge" or step, as opposed to he was sitting or laying there as they were 7 feet 5 inches away.

And so that's what they're -- in fact, not to

oversimplify their position, but I think their brief says, well, we agree that there really aren't any really disputed issues of fact until we get to the closet incident where they said, Otis go. You're going to be -- you're going to be bitten. And then ordered Otis, after they knew he was in the closet.

So his position, and I don't mean to be disrespectful by not using decedent's name, but by his position they say is a seriously disputed issue in the case?

MR. COLLINS: If I may address all of those, Your Honor?

THE COURT: Yes, please.

MR. COLLINS: First of all, the "statement" that Officer Christensen gave was not a statement. It was an unsworn -- in answers to interviews. And I've cited case law that an unsworn statement from a nonparty could not be used to create an issue of fact.

THE COURT: But the case that you cited -- in fact, if I don't consider that statement, it will be -- in other words a statement like that, is sometimes key evidence in a major, major, major, major, criminal case.

And I say that both having come back to back, and I have a third -- another sex trafficking case started. And as a former prosecutor, myself, up in St. Louis County and

many, many cases, apart from this civil case.

But when the BCA, as I mentioned the case you cited, earlier, the *Zubrod* case, where it was handwritten statements by the paramedic -- two paramedics, as opposed to you're saying I must ignore what a BCA investigator asked a police officer right after an event and I must set that aside in the case?

So even if we were here and he was on the witness stand, that I'd have to say, Look at, that's all admissible evidence, you can't -- you can't use that?

MR. COLLINS: Well, I mean, if he's on the stand that's absolutely different, Your Honor, then he's a witness. But that's not his sworn statement that -- that the rules of evidence are very clear, and so are the -- the case law on what needs to be submitted by the Plaintiff to create an issue of fact.

What -- Officer Christensen's unsworn interview is not hearsay, it's not a party-opponent admission, it's hearsay itself.

And plus the -- the language that they cite from that "that interview" is not what he said.

If you take a look at it, for example, for the -- for the proposition that he -- that Officer Christensen allegedly saw -- saw Mr. Birkeland laying down before shots were fired.

First of all, before I can get to that, we presented evidence, video evidence, that shows that it was impossible for him -- for Mr. Christensen to look inside the closet prior to the shots being fired.

Plaintiffs don't dispute that once in their briefs, because they can't.

He was outside the --

THE COURT: Bedroom.

MR. COLLINS: -- bedroom the entire time.

Second, if you look at his interview, he never said he saw Mr. Birkeland lying on the floor. He said, yes, apparently, but I could only see his foot essentially.

THE COURT: Right.

MR. COLLINS: That's not the same thing.

Also they cite that -- his interview for the proposition that Otis was allegedly biting Mr. Birkeland after the shots were fired.

He didn't say that at all. What he said, and I'm quoting, he said, I think he did. I couldn't see if he -- he being Otis, had a bite. That's not even close to saying, I saw him biting.

So even if you were to consider it, Your Honor, which I argue you can't, but even if you were, that's not what he said.

Plus we have physical -- we have video evidence

that shows that it was impossible for him to even look in the closet from the position he was. He was the one wearing the audio, the body camera video.

Plus, if you -- when he was asked about all of that during his deposition he -- he said, no, I didn't see it.

The first time he ever saw that interview or a transcript of that interview was the day before his deposition.

He never saw it in conjunction with the video. Once he saw it in conjunction with his video, he says no, this is not right. There's no way I could have.

So it does not create an issue of fact, Your Honor. There is no issue of fact as to Mr. Birkeland stabbing the canine right in front of Officer Jorgensen, 7 feet, 5 inches away from him inside the closet.

There's no disputed fact that Mr. Birkeland, after he stabbed the canine, turned towards the officers with a knife in his hand.

THE COURT: Now when you say turn towards, so there's no issue about whether he was sitting, standing, laying, lunging?

MR. COLLINS: Well, to me it's not -- it's not an issue of material fact.

Because we have -- we have physical evidence that

he was -- Mr. Birkeland was facing a closed closet door at the time the -- the dog bit him. We have evidence that the dog bit his right thigh.

And then we have evidence of gunshot wounds to his chest, entry wounds to his chest. So he had to turn towards the officers with the knife in his hand.

So, it's not just the officers saying this.

We have -- we have the dog bite, the medical showing that he got bit on the right side.

He stabs the dog with the knife. The dog releases the bite. He turns towards. And that's when the bullets unfortunately hit him in the chest when he was facing the officers. So he had to have turned and faced him.

And the Plaintiff's experts don't disagree with that, Your Honor. They don't dispute that Mr. Birkeland turned towards and came towards the officers with the knife.

They only dispute -- they basically provide an explanation as to why he did. And they -- and they contend that Mr. Birkeland could not have lunged toward the officers, but they do not dispute that he moved towards them.

And in the case of the *Estate of Morgan versus Cook*, Your Honor. The Plaintiff made a similar lack of lunging argument. And the Eighth Circuit Court of Appeals said that may be true, but that doesn't -- is not

determinative of whether or not the shooting was justified.

The fact that in the *Cook* the Eighth Circuit said by simply lifting one foot as to make a step in the direction of Officer Cook, gave Officer Cook a probable cause to believe that Morgan was a deadly threat.

In our case, Your Honor, it was much more dangerous than the *Estate of Morgan* case. In the *Estate of Morgan* case, this was a person that was on the porch.

THE COURT: Right.

MR. COLLINS: He was 12 feet away from the officers. He kept the knife down at his side.

Unlike our case where Mr. Birkeland not only did not keep the knife down by his side, that he stabbed the canine, police canine in the neck right in front of an officer, 7.5 feet away, and then turn toward the officers, and then moved towards the officers.

This is consistent with the *Kim versus* -- I want to make sure I've got this right, Your Honor, *Santa Clara* case in the Ninth Circuit Court of Appeals.

They upheld the use of deadly force after a knife-wielding suspect stabbed a canine in front of a police officer and simply leaned towards a police officer. And they held that instantly became a potential deadly encounter, therefore upholding the use of deadly force in this case -- in that case, Your Honor.

And then we have the Supreme Court, Your Honor, in *Kisela v Hughes* who said, "No movement is even necessary for a person to consider a threat of deadly force."

In that case, Your Honor, we have a woman who was reported to have -- with a knife, that moved towards a citizen who happened to be her roommate at the time, the officers didn't know that. Stopped about six feet away. Had the knife down at her side, didn't move, didn't make any gestures.

And the -- the U.S. Supreme Court said that the officers were justified in using deadly force against -- I think it was *Hughes*, because they had probable cause to believe that she was a deadly threat to that citizen. And obviously, our case is a lot worse than the *Hughes* case, Your Honor.

We had a person stab a canine, not have the knife, showed the officers, displayed the officers the knife, showed right in front of the officers that he was willing to use the knife, severely injured a police canine less than 7 feet, 5 inches away, and clearly that was closer than that, 7.5 inches is the diameter -- it was the length of a closet, so we know it's closer than that.

And then we have the undisputed evidence that he turn toward and moved towards the officer with that knife.

Based on those cases and the undisputed evidence,

Your Honor, we believe that the officers are entitled to qualified immunity.

And as I said, the -- the Plaintiff's experts do not disagree that -- that Mr. Birkeland moved towards, turned towards the officers.

They simply contend they provided a different explanation as to -- or the reason why he did move towards the officers.

But they, again, like in the *Estate of Morgan*, they contend they couldn't lunge. But just like in the *Estate of the Morgan* case, that may be true, but that's not determinative if he still turned towards and moved towards the officer with a knife in his hand.

Now, with regard to the remainder of the Plaintiff's claims, Your Honor, they have a *Monell* claim, which they have failed to produce any evidence for any of a policy that required the officers to act, to compel the officers to act unconstitutionally, or a pattern of unconstitutional conduct.

THE COURT: Well, and I suppose the question will be, maybe we'll see what Plaintiff's say, as I believe that the Roseville City Police Chief, as I understand said -- and whether that's true or relevant today, in terms of something that would happen in 2019, but saying, we had no policy for the community caretaking. We have no policy for intoxicated

individuals. We, in fact, it wouldn't have violated any rule I'm aware of, the Chief said, if they would have just left.

And but -- and so they said, we have no policy. So I don't know. We'll see if Plaintiff says it's the absence of a -- of a policy, but. So we'll see what they say because that's --

MR. COLLINS: And if I could address that, Your Honor.

THE COURT: Well, certainly.

MR. COLLINS: But the lack of a policy, and they have to -- they have to show this as a *Monell* claim, too, is they have to show that a lack of a policy led to Mr. Birkeland's death.

THE COURT: True. True.

MR. COLLINS: And there's no evidence of that whatsoever.

Whether or not there was a policy that they could have walked away, or whether there's a policy, a specific policy on community caretaker functions that has -- that it has no relevance to whether or not a reasonable officer in Officer Jorgensen and Eckert's position would have considered and have probable cause to believe that John Birkeland was in threat of imminent deadly force, which he was.

They also -- they have a failure to supervise claim against Sergeant Adams.

THE COURT: Adams.

MR. COLLINS: For the same reasons, Your Honor, they have failed to show any evidence of a pattern, a notice of a pattern of constitutional conduct that led to John Birkeland's death, nor do they show a pattern or any evidence that he deliberately, or indifferent or passively authorized any act that led directly to the death of John Birkeland. And so that claim must be dismissed as a matter of law, Your Honor.

Now we get to the common law claims, Your Honor. And I'll touch on them briefly. We -- we did, in our brief, touch on each one --

THE COURT: Right.

MR. COLLINS: -- of the entry and the use of a canine, Your Honor, for the purpose of showing that the officers did, even if the Court were to consider, and, you can consider the entry and the use of a canine. But even if you did consider them, their use, their entry was constitutional, it was reasonable under the circumstances, and the use of the canine was reasonable under the use of the circumstances. So I'll leave that to my argument in the briefs, Your Honor.

And then, finally, with regard to the common law

claims, Your Honor.

It's undisputed that the -- the use of force policy in which the officers were acting allowed for the use of discretion when using deadly force.

And there's no dispute that both Officers Jorgensen and Eckert used -- exercised discretion when using deadly force and, therefore, they're entitled to official immunity.

And also, and accordingly, their employer, the City of Roseville, is entitled to vicarious official immunity.

And one other very important point to make, Your Honor, that this isn't a case where one officer shot and the other didn't.

These officers analyzed and perceived the same threat and shot almost simultaneously.

THE COURT: Shortly after Otis yelled, I guess is the word, we'll use, shortly after --

MR. COLLINS: Shortly after -- shortly after Mr. Birkeland stabbed Otis in the neck, which made him yelp. And shortly after Mr. Birkeland -- Mr. Birkeland turned toward and came towards them with a knife. And you can hear that in the audio, where Mr. -- Officer Jorgensen is saying, repeatedly telling him, Drop the knife. Drop it. Drop it. Drop it. Drop it. And he wouldn't.

And he kept coming towards the officers and this -- and, therefore, the officers are entitled to qualified immunity.

THE COURT: Let me --

MR. COLLINS: Sure.

THE COURT: And then I'll ask the same question of Plaintiffs. And there may be an issue of, well, is it relevant or not, and even if it is, does it change the issues of objective reasonableness?

In terms of the officers -- the knowledge they had -- because I believe it was Officer Christensen a few months before had been to the home and had arrested -- he'd had been arrested, in fact, there was a warrant.

And then enforceable warrant, even though they said there's a -- we have an arrest warrant, because they can't use those. There was $500 bail on that because you can't use them at night, which is still the law today and it was a law back when I was a prosecutor many, many years ago.

So they get there -- and so is it relevant, the knowledge they had, you know, the 911 dispatcher said, we've been there before, there's mental health problems. And then we have the -- of course, and then we later find out about the two-way alcohol test.

But is there any relevance to that?

Because the -- and then this is going to be a

two-part question because I think Plaintiff's are going to suggest that, well, there's an issue of fact. And I anticipate you're going to say, well, even if it's an issue of fact, it's either not relevant or not material.

And that is, well, was Otis the dog reengaging the Plaintiff, the bite-and-hold issue, for example. Well, was the dog dragging him out on bite and hold? Because I think they're alleging that that -- that itself is what -- or was -- well, I won't repeat what's in their brief. But I just wanted to -- I guess it's two parts, kind of unrelated.

One is, what's the relevance of the knowledge they had about prior contacts? They had been to a hospital for -- on a 72-hour hold within a year, I believe, before that.

And then they had -- at least Officer Christensen had had contact with him and arrested him. And there was -- for a failure to appear on a -- for a court date, then there was a $500 bail set on that, which is still the way most districts do it now.

But what's most important from your client's point of view for me to understand about that?

We'll see where Plaintiff focuses, if they do focus on those issues. But what's most important for me to understand about that kind of -- I apologize for the narrative. I know there's a couple of questions rolled into

that.

MR. COLLINS: That's fine. Just so that I'm clear, you want -- you want me to provide an answer to the issue of prior contacts?

THE COURT: Right.

MR. COLLINS: And the also the pulling out of the closet?

THE COURT: In other words, yeah. Well, and the dog issue.

MR. COLLINS: Okay.

THE COURT: Because there seems to be -- I think Plaintiff is going to suggest that, well, what really happened is there was upon -- there couldn't have been movement towards the officer because Otis was -- as canine's are trained was to bite and hold and drag out.

And then unrelated to that is, well, what's the relevance in terms of what an objective officer would do if they say, hey, we've got this mentally ill person with or without knowledge of the intoxication?

And prior visits and prior contact, apart from what the 911 dispatcher had said to them when the person called.

MR. COLLINS: Okay. I'll address the prior contacts first, Your Honor.

THE COURT: All right.

MR. COLLINS: With regard to the prior contacts, the only person -- Officer Christensen was a secondary officer at the incident that was -- that was involved Mr. Birkeland at Roseville Mall, I believe it was a couple months before this accident happened. He had no contact with Mr. Birkeland at that time.

They were informed that this -- this residence that they called to -- the 911 was called to, that they had been called there before.

But the main issue, or the main fact is, they didn't know who was inside the apartment at the time.

None of the officers knew how many people were in there. They weren't sure if it was John Birkeland was in there, there was a person that was responding to John.

And then that person was responding saying, I'm fine. I'm fine. But then he mentions, I had -- I just -- I've been robbed, again. Which Officer Christensen, who was an CIT trained officer, that light -- that set off an alarm bell in his head. And he said, okay. We need to talk with you about that. And in his head, as he said in his deposition, I can't walk away from that. We got to find out if he's okay.

There was no information to them knowing that whether or not they were dealing with a John Birkeland, and whether or not this was a mental health issue that they were

dealing with.

They were -- the information they came there on the call was for loud noises coming from the apartment.

And once they get there, they hear a person on the other side of the -- of the door pleading, Please give me what I -- expletive. Please give me.

And so that -- obviously a change in circumstances when they get there.

And they -- they have to deal with that situation in their community caretaker function. And they -- they decided they couldn't leave the situation. They needed to get in there to see if, number one, if there was an active robbery going on or whether or not there was a victim of a violent felony. And that's why they entered, Your Honor.

So the prior contacts normally would -- would come into play.

But in this instance, they didn't know who they were dealing about.

They knew that the apartment was leased to John Birkeland. They didn't know if John Birkeland was in there or somebody else was in there.

Obviously when you hear somebody pleading with someone else, it's reasonable to conclude that they're pleading with someone.

So they didn't know how many people were in there.

They didn't know what the circumstances were. All they knew what they were dealing with was a potential victim of a violent felony and they needed to check to see if he was okay or not.

THE COURT: But then on the advice then of Mr. Adams.

MR. COLLINS: Uh-huh.

THE COURT: Even though he had had the training with the mental health issue, he then told the officers, "Tell them that he's under arrest and there's a warrant for him." Even though that warrant, of course, they couldn't have enforced it because it was 10:00 at night.

But that was Adams', I think, the directive to the officers, "Tell him he's under arrest and that there's a warrant."

MR. COLLINS: And that was after the door was breached. That was after the officers were already in the apartment.

And Officers Adams and all the officers testified that they did that in hopes that people would come to them, which is a typical and practice police tactic.

Instead of rushing into an apartment, they -- they breached the door, let the door breathe, and call into the apartment hoping that people would come to them instead of forcing the issue.

And Officer Adams did direct, I believe it was Officer Vang, to say, tell him he's got a warrant.

THE COURT: Uh-huh.

MR. COLLINS: Next time you yell in and say, hey, John come out, you know, with your hands up. Next time tell him that he's got a warrant.

And they did that with the hopes that John or somebody else would come out of the apartment, unfortunately didn't.

With regard to the second issue, Your Honor.

THE COURT: Yep.

MR. COLLINS: The Plaintiff's experts, their position is that their explanation as to why John was coming towards the officers is that they believed that Otis was still attached to John.

Mr. Birkeland, at the time shots were being fired and were being pulled towards them.

And -- but, Your Honor, their -- the Plaintiff's have two canine experts and their opinions are not based on fact, but on pure speculation.

I'll give you some examples, Your Honor.

With regard to Plaintiff's expert Kyle Heyen, his entire opinion -- that opinion that he's being pulled out by a dog, is based on the faulty assumption that Officer -- because Officer Jorgensen allegedly never said, or

testified, that Otis released his bite. That we must assume he never released his bite.

But the fly in that ointment in that argument is Jorgensen did testify that Otis disengaged in the bite after he was stabbed in the head by John Birkeland right in front of Officer Jorgensen. And Officer Jorgensen prevented Otis from reengaging the bite. And that's in Exhibit I of his deposition, which is our Exhibit I, Page 144.

Now, Plaintiff's second canine expert witness, Ernest Burwell makes the same fatal flaw, Your Honor.

His opinions are based on the speculation that canine Otis barks unless he's biting someone. Well, there's absolutely no facts, no evidence to support that. And we have -- I invite you to listen to the audio and look at the video again.

THE COURT: I will.

MR. COLLINS: You don't hear Otis barking the entire time at all.

You hear him bite -- you hear him barking, but not continuously.

Plus, the canine handler, Officer Jorgensen, never testified that he was trained that way. We have no training records to show that either. They're making this up of whole cloth, Your Honor.

And then Mr. Burwell relies on the misstatements

of the answers, which I already addressed to the Court.

THE COURT: Right.

MR. COLLINS: Regarding Mr. Christensen's unsworn statement to BCA, which I have pointed out are not true, absolutely incorrect.

And then, finally, he bases this pulling of Birkeland towards the officers on -- there's a trajectory of a bullet that didn't hit Mr. Birkeland and -- which is impossible to tell where a person is located or what they're doing unless the bullet hits, so it's absolutely irrelevant.

The fact of the matter is, Your Honor, there's no dispute that he was -- that Birkeland was coming towards the officers with the knife, whether or not he was being pulled or not.

There is no case law, and the Plaintiff has not cited any case law, that an officer is forbidden from using deadly force to protect themselves against a knife-wielding suspect whether or not gravity's pulling them towards them, whether or not they're ready to bite.

The fact of the matter is he was coming towards them. The Plaintiffs do not dispute that. The Plaintiff's experts don't dispute that.

And, therefore, their theory that he was being pulled out by a dog just doesn't hold water, Your Honor.

And even if it did, it wouldn't matter because the undisputed facts are that he was coming towards them with a knife in his hand.

THE COURT: All right.

MR. COLLINS: I hope I answered your questions.

THE COURT: All right. I'll hear from Plaintiff's Counsel. And I'll make sure there's time for both rebuttal and surrebuttal.

MR. COLLINS: Thank you.

MR. BEHRENBRINKER: Good morning, again, Your Honor.

THE COURT: And obviously, not unique to this case or this type of case, but consistent with a number of cases where we're here in summary judgment fashion, obviously the two of you part company on a number of issues.

Significantly one is, well, is there truly any genuine dispute of a material fact? And what's properly before the Court? So.

MR. BEHRENBRINKER: Okay. Thank you, Your Honor.

The Court -- may it please the Court.

The Court should deny Defendants' motion for basically two reasons.

First, after reviewing the record evidence in a light most favorable to the Plaintiff, a reasonable jury could conclude that the killing of John Birkeland by the

Defendant police officers was an -- was an objectively unreasonable use of deadly force.

And, second, a reasonable jury could conclude that the constitutional right to be free from such objectively unreasonable conduct was clearly established as of February 10, 2016.

Now, before I get into discussing the facts, which are key to this case in detail, I would like to respond very briefly to a couple of statements that Counsel made.

First, several occasions during oral argument he said that the Defendants' experts agree that John Birkeland was coming toward the officers at the time they shot him. That's not true.

THE COURT: You meant Plaintiff's experts.

MR. BEHRENBRINKER: I'm sorry, Plaintiff's, I did, Your Honor, thank you. You're listening, thank you.

Plaintiff's experts opined or agreed that John Birkeland was coming at them at the time the officers shot. That's a false statement. That's completely untrue.

And I refer the Court to the expert affidavit reports of the three police practices experts offered by the Plaintiff in connection with this case.

All three of them working independently reviewing the record evidence in this case concluded, independently, that John Birkeland was sitting passively at the rear of the

closet at the time he was shot by the officers.

All three of those experts also independently concluded, and it's their opinion based upon their education, their special training, and most importantly their work on this particular case, that John Birkeland did not actively resist the officers. Did not make any type of an active resistance or assaultive-type move towards the officers when they shot and killed him.

Rather, he was sitting passively on a box in the rear of the closet.

The Plaintiff's own expert, their reconstruction expert --

THE COURT: Defendants' own expert.

MR. BEHRENBRINKER: Defendants' own expert, a reconstruction -- purportedly a reconstruction expert concluded that given where Mr. Birkeland was shot and killed he would have died incapacitated immediately. He would not have been able to get up and run, or lunge himself or what have you.

And there's no nowhere in the Defendants' expert report that says there's any evidence to suggest that Mr. Birkeland got up from -- or moved from a sitting position to lunge at the officers.

THE COURT: Well, what -- what of the issue of -- and I'm -- not to paraphrase, and I'm sure Counsel will

correct -- if I've misunderstood the argument in their brief or here.

But, well, even apart from the issue of lunge, that the turn or a movement toward -- given the 7 feet 5 inches might be sufficient to justify the deadly use of --

MR. BEHRENBRINKER: Not under the circumstances presented in this case.

We greatly differ with the Counsel's interpretation and representations to the Court that Mr. Birkeland even made a turn toward the officers.

The evidence in this case that we've presented, and our experts -- and I refer to the Court to the detailed expert affidavit report, nowhere in there do they say that he turned or made any type of a movement toward the -- toward the police officers.

In fact, Mr. Burwell, I refer the Court to the reconstruction that he did, that was based upon his analysis of the autopsy -- the final autopsy report, photographs of the decedent, as well as BCA photographs showing with rods in the wall and various measurements, showing the directional and the direction, and the -- the angles of the various shot. Most importantly the shot that missed Mr. Birkeland, because the officers fired four times. Three hit him, one in the neck and two right in the upper part of his chest, killing him almost constantly.

And according to their expert, he was incapacitated and incapable of any movement once he was shot.

It's clear the photographs from BCA and the accident reconstruction performed by Mr. Burwell show, and BCA photographs show, that the box that John was sitting on in the closet was tipped over and his body was -- his head was on right near that box.

The testimony and the photographs of the BCA took also show that the right leg of John, below the area where the dog had been gnawing on inflicting very serious wounds to John's right knee area, exposing ligaments and fascia, and his patella bone, making it also impossible for him to get up, or to lunge, or anything like that, but show that his pants where the dog reengaged, as they are trained, in Mr. -- and as expert Heyen testified, that according to the certification that this canine, the Roseville Police Department has, it was trained to reengage immediately.

And --

THE COURT: And that's another way of saying bite and hold?

MR. BEHRENBRINKER: Bite and hold. That's correct, Your Honor.

That's how he's trained, and he was well trained and he did his job, in accordance with the certified

training that the dog had completed and the way police dogs are trained all over the country.

But in Plaintiff's memorandum in opposition to the Defendants' motion, Your Honor, we presented, we believe, significant evidence showing that Plaintiff has sharp differences with the Defendants' version of the events leading to the death of John Birkeland.

THE COURT: Well, I think you've said that, well, up until -- the facts are mostly in agreement until you get to the closet door?

MR. BEHRENBRINKER: Well, we did say that in our brief. But according to Defense Counsel, they made several statements here this morning that we very much disagree with.

And so if it pleases the Court --

THE COURT: All right.

MR. BEHRENBRINKER: -- I would like to talk about our version of the facts, based on the record evidence that we have presented to the Court.

There was -- we believe there were several inaccuracies stated by Counsel in their brief, as well as repeated here this morning in oral argument.

But we believe, Your Honor, in -- obviously the Defendants are arguing qualified immunity and requesting that the case be dismissed on that basis.

But in analyzing qualified immunity, the Court resolves all issues of material fact in Plaintiff's favor.

Based upon the record evidence that we believe we've presented both in our Memorandum of Law opposing their motion is our exhibits incorporated as part of the evidence, the record evidence, including the affidavits of Ms. Jenelle Lundgren and three police practices experts, we believe that the Defendants(sic) have presented record evidence sufficient to show that the Defendants are not entitled to qualified immunity because:

One, the Defendants' conduct violated a constitutional right, and that right was clearly established on February 10, 2016, when the Defendant shot and killed John in his home while responding to John's neighbor's request for a welfare check.

And qualified immunity cases, Your Honor, this usually means the Court adopts the Plaintiff's version of the facts.

Now, I would like to talk to you about what we believe are undisputed facts or indisputable facts, but what Counsel in their brief and here this morning described as disputed facts.

And about -- everyone agrees, no one can dispute, 9:55 p.m. on February 10th, John's next door neighborhood, Megan Blommer called 911 and asked for a welfare check on

John.

Blommer told the operator that she heard a man yelling and screaming and throwing things in his apartment, in his home. She mentioned her neighbor might have mental illness.

Very close in time, almost simultaneously, John's other neighbor, Erin Marone -- Marone, she also called 911 and told the operator that the man in Apartment 11, her next door neighbor, was having another verbal outburst inside his home.

Both neighbors mentioned that they heard a man yelling in what sounded like throwing or breaking glass in the apartment.

At about 10:00 p.m. the City dispatcher sent two Roseville City Police Officers, Vang and Christensen, to John's home, telling them that, "A male who lives in Apartment 11 and who has possible mental illness was banging on his walls and throwing things in his apartment. And it looks like we have been there a couple of times before."

I refer the Court to the transcript, which is part of Jenelle's -- of the dispatch transcription of the dispatch recording, which is part of her affidavit, and is part of the record.

There's no dispute that officers were sent to John's home, Your Honor, to check on John's welfare. That

was the purpose of their call.

But while driving to John's to check on his welfare, Officers Vang and Christensen both learned that a non-nightcap warrant was active, stemming from, as Counsel stated, a January 21, 2016, a misdemeanor citation for giving the wrong name to a police officer and in failing to show up to court, so there was a misdemeanor bench warrant active.

The police officers knew and understood when they arrived at the scene that a misdemeanor warrant did not allow them to arrest John in his home after 10:00 p.m. at night, pursuant to Minnesota law.

It was then when Christensen and Vang arrived at John's home that Christensen turned on his body cam.

THE COURT: Body cam.

MR. BEHRENBRINKER: Now I refer the Court to the affidavit of Jenelle Lundgren, which is part of the record evidence as the audio video recording from Christensen's body cam.

Her transcript -- the transcript is part of Exhibit 2. And the actual recording is Exhibit 6. These are Court Exhibits 50-2 and 50-6 respectively.

Lundgren's affidavit includes the audio portion of Christensen's body cam.

At about 1:15-minute mark -- or 1 minute and 15

second mark on the body cam, Christensen knocked on the door and shouted, "John, it's the police, open the door."

Within four seconds of that initial call, John responded, "Oh, I'm okay." Almost immediately Vang said, "John, open the door." One second later, John replied, "No, I'm okay."

Over the course of the next several minutes, John spoke with the officers through his apartment door.

At Page 7 of our memorandum, Your Honor, Document 49, we set forth in our brief a verbatim transcription of John's conversation with the officers.

On at least five separate occasions John told the officers he was fine, he was okay, that he was trying to find something, and he found it.

He also said to the officers, "No, I'm fine. I was trying to find my billfold and I got robbed again."

It is important -- it is indisputable, Your Honor, after Christensen's first knock on John's apartment door, John stopped yelling, he stopped cursing, he stopped screaming, he stopped throwing things in his apartment. There were no sounds like breaking glass coming from inside John's apartment.

In fact, Christensen's body cam shows that John was calm when talking to the police. John did not sound agitated. I refer you to the actual recording.

He did not sound alarmed. He did not sound as if he were in distress. He was not crying. He was not moaning or anything like that. John spoke slowly and he spoke deliberately to the officers.

John was not verbally threatening the officers.

He was not verbally -- he made no verbal threats toward anyone.

John was not rude to the officers.

John simply told them he was fine, he was okay.

At the 2:31 mark of the audio, Christensen to Vang, "If he is saying he was robbed, then we got victim of a violent crime."

A reasonable jury, Your Honor, based upon the record evidence, could disagree with Christensen's statement.

A reasonable jury could just as easily conclude John was fine. He was okay. But he did not want to consent to the officers coming into his home because he did not need any help.

20 seconds later, at the 2:51 mark, Vang ordered John to open the door and he said, "I don't want to have to kick it in."

Over the next several minutes, Vang and Christensen repeatedly threatened to kick in John's door if he didn't open it.

The purpose of the call was to check on John's welfare. A welfare check. To see whether John needed any medical help. That's a purpose of a welfare check.

John was not suspected of committing any type of a serious arrestable offense for which he could be arrested in his home after 10:00 p.m. at night.

At the time, based on John telling the officers he was okay, he was fine, and so on, the officers, as you discussed with Counsel, could have left.

In fact, as the Court pointed out, Chief Mathwig testified during his deposition, it would not have violated any City policy if the officers would have left John's apartment at that time based on the record.

That's Mathwig's deposition, which is Exhibit 24 at Page 2016, Document 50-24. But the officers chose not to leave.

In fact, at the 4:15-minute mark of the body cam audio, Christensen announced other the radio, "Well, we're now forcing entry."

But Sergeant Adams told them over the police radio to hold off on kicking over the door. Adams was on his way with reinforcements.

Again, at the 7:33-minute mark, an officer can be heard yelling, "John, your door's going to get kicked in, okay? John. That is where we are at right now. Okay?"

It's important after listening and communicating from outside John's door, Your Honor -- and we pointed this out in our brief, that both Officer Vang and Christensen concluded that John was alone in his home.

Those officers never heard any -- and they were there from the beginning, they were the ones that were listening. They were the ones that were communicating with John. They were the ones that were calling him John throughout. And he was responding to them calling him John.

The officers never heard any type of a noise, or anything coming from John's home that indicated there was a second person present in John's home.

They had no reasonable to believe, they had no probable cause to believe that there was a second person in that home.

Once Sergeant Adams arrived at John's apartment door, he took over supervisory duties and responsibilities for the call. Adams was now in charge.

At that point now, Your Honor, in the timetable, there were at least seven Roseville police officers outside John's apartment door in the hallway of the building to check on John's welfare, including a police canine.

At 16 minutes and 21 seconds on the body cam audio, this is about 12 minutes after Christensen first announced that they wanted to kick in John's door, Defendant

Adams can be heard saying to the officers, "I know that you obviously did, but for breaching purposes, and what sounds like court purposes, you have heard enough to be concerned for his safety to go check, I'm assuming.

By that statement, Your Honor, a reasonable jury could conclude that Adams did not have sufficient information to reasonably conclude.

He was the supervisor, he was in charge. He did not have probable cause to believe that there was a reason to breach that door.

THE COURT: Well, separate from whether he had a reason or didn't, one of the first things he said to -- said to the officers when he got there is the phrase is used 'EDP.'

MR. BEHRENBRINKER: Right.

THE COURT: Emotionally Disturbed Person.

MR. BEHRENBRINKER: Correct.

THE COURT: And then I guess it was all his advice -- it was also his advice, for better, for worse then to say -- and start telling him he was under arrest and there's a warrant?

MR. BEHRENBRINKER: That's correct, Your Honor.

He asked -- that's basically exactly what he said, was that -- it's in the transcript of the audio cam, and you can hear it on the audio cam.

He asked Christensen -- or words to the effect, so we're dealing with an EDP.

THE COURT: Right.

MR. BEHRENBRINKER: Or as you said, Emotionally Disturbed Person and his response was, yes, or, that's what we think, or I think so, or words to that effect.

A reasonable jury, Your Honor, based upon the totality of the evidence would conclude that there were no -- at this point, when they decided to breach that door, there was no exigent or emergency circumstances.

For one reason, the officers had waited over 15 minutes before entry to John's door.

Up to that point, John had committed no arrestable offense. He had not verbally or otherwise threatened anyone. There were no reports of any criminal conduct. John had not attempted to leave his home or to flee the officers.

At the 18:20 mark on the body cam, Adams started -- personally started to break down John's door using a battering ram.

Two minutes later at the 21:11 mark on the body cam, the purpose of the police presence changed, Your Honor.

And that's important. Because it went from checking on John's welfare, to forcing entry to John's home for the purpose of making an arrest.

THE COURT: Well, there's a question I have. And maybe one or both parties will say, well, that's a nice hypothetical, Judge, but it's irrelevant.

I've had cases over the years -- and, again, every case must be examined as its own, where if they would have walked away, regardless of what was being said, and then let's say the individual involved had committed suicide or harmed themselves, then the response is, well, in a community caretaking function, if -- if you should have entered -- not to arrest him, not to arrest a person, you weren't entering to arrest, you were entering to check on the person.

So what's most important for me to know from you about, well, here's the relevance or irrelevance of that issues?

Because I'm assuming before we're done here you're going to be saying that, well, regardless of whether it was a lawful entry or not, that doesn't change the -- what happened with the deadly use of force and the use of the canine.

I assume that's kind of how I interrupted you to really say, well, we say it was unlawful entry. But even if you find it wasn't, the result on deadly use of force, and then separately the use of the canine, because there's separate counts alleged in the complaint, but the --

MR. BEHRENBRINKER: Clearly -- well, first of all, let's take the welfare check under the community caretaker function.

THE COURT: All right.

MR. BEHRENBRINKER: First of all, officers -- the test is one of reasonableness and when looking at a violation of a Fourth Amendment right.

In this particular case, the totality of the circumstances, the record evidence that we have presented here, in our brief and with all the exhibits in the affidavits show that there were -- it was objectively unreasonable for the officers to force entry to John's home, even acting under their so-called welfare check or under their community caretaker function.

Why? Because a reasonable officer, a reasonably objective police officer did not have probable cause, did not have a reasonable suspicion that there was a medical emergency in that apartment.

Based on the facts, based on the totality of the evidence that we have presented, John was responsive to the officers, he told them, No, I'm fine. He told them at least five separate times talking to them calmly, I'm fine. I'm okay. Everything's good. I don't need help. I --

The officers said -- or Christensen, I believe, it was, and Vang both testified that when Christensen turned on

his body cam when he got there, for whatever reason it is unclear to me, but they claim the first 30 seconds on the body cam aren't recorded.

And they claim that while they were listening, before they announced themselves, they could hear John in the apartment crying, sobbing, weeping, and I believe they may have even said that they heard breaking glass. Okay?

Then it -- when it starts recording, is when he first announced himself, "Police." He immediately becomes quiet. Within four seconds of the initial knock, John's responding. He's telling them, No, I'm fine.

He talks to them over the next course of the several minutes. Five separate times, he's responsive to them, he's telling them, "I'm fine. I'm okay. He doesn't consent to open the door to his home.

THE COURT: What about the --

MR. BEHRENBRINKER: That does not -- I'm sorry.

THE COURT: You've touched on this before, whether the -- what is the significance, if any, of the reference to being robbed and being robbed again, the billfold?

MR. BEHRENBRINKER: Part of the police contacts, and I don't recall specifically if this was in our brief or not, but it's in -- it should be in the discovery, or part of the exhibits if the deposition transcripts were all

there.

But my recollection is, Your Honor, part of -- some of the police contacts involved, I believe there were three prior contacts with John. None of them involved any type of violence, none of them involved any type of a weapon. Nothing involved arrestable offenses. They all involved incidents relating to his mental health problems, and/or alcoholism.

One time, I believe he was in a restaurant, he had been denied or he felt that he had been denied unjustly, I believe, it was worker's comp insurance or something got messed up. And he was drunk and the police were called and they summoned an ambulance, and the ambulance took him in for a 72-hour hold for a psychological evaluation and chemical dependency assessment.

The other -- one other time, he -- I believe John may have called the police to his apartment because he had been a victim. Someone had took his iPad. And -- or he thought someone had taken his iPad, and I believe he may have been drunk at that point in time.

Another time they went -- I believe they also went to his apartment. He was drunk. He was depressed. And if my recollection serves me correctly, the Roseville Police Department summoned an ambulance and he was taken in for a 72-hour hold.

If I'm not mistaken, Your Honor, I believe that the record shows that on at least two prior occasions, the Roseville Police Department were aware of his mental health issues and -- as well as possible alcoholic, or alcohol-related symptoms, or drunken, and being despondent or whatever, when you mix the alcohol with his depression, and so on.

And he was -- he was taken by ambulance to -- for a 72-hour psychological.

THE COURT: Well, I guess where that takes us now, the door is down, and where do we go from there? The door is broken down.

MR. BEHRENBRINKER: Okay.

THE COURT: Or breached.

MR. BEHRENBRINKER: The door is broken down. They breached the door.

Well, let me just -- your question was, does it make any difference about whether or not it's a welfare check versus -- clearly under welfare check, under the totality of the circumstances here, it was not -- a reasonable officer did not -- would not conclude that it was probable cause to force entry and violate his constitutional rights under the Fourth Amendment.

Whether -- if it's -- if it's an arrest, which we believe, Adams changed the focus and changed the reason in

midstream to, we're here now to arrest him. We're going to arrest him. Because that's what they told him, they told him over, and over and over.

Clearly you can't break down a door and go into a house and arrest him with an invalid warrant. And they -- they weren't -- it was an illegal entry based if -- based upon the warrant. Because then they announced -- they announced, You are under arrest. We have a warrant for your arrest. The only warrant.

And that he advised him that based -- strictly on Adams' instruction, Vang announced, You're under arrest. We have a warrant for your arrest. He wouldn't have said that but for the fact that Adams ordered him to say it.

Adams, Jorgensen and Eckert, the three named Defendants in this case, Your Honor, all knew and understood that they could not legally break down and force their way into -- whether it's under the community caretaker standard or whether they're there to execute an invalid unenforceable warrant. There is simply no probable cause based on the totality of the circumstances at that point for the break-in.

And moreover, Your Honor, they say it didn't have anything to do with the active warrant. They were there to check on whether or not we have a medical emergency or whatever. That's disingenuous, we believe, because the day

after John was shot and killed, Chief Mathwig at his deposition acknowledged, the City issued a press release telling the public that the forced entry of John's home was justified for reasons, including that John had an active warrant for his arrest.

Chief Mathwig also admitted during his deposition that the night-capped misdemeanor warrant was part of the reason for breaking down John's door entering his home.

That is what the Chief said in his deposition. That's what the City said. And he acknowledged in a post-killing press release.

At 22:04 mark, Your Honor, of the body cam, Sergeant Adams, the door now is breached. It's wide open. Ordered that canine Officer Jorgensen to move his police dog into the position at the open threshold of John's house or home.

Over the next minute, with the dog barking, and it's in the --

THE COURT: Uh-huh.

MR. BEHRENBRINKER: -- in the video, or in the audio, video, ferociously Jorgensen yelled to John, "Come to the door now or we're going to send in the dog. The dog will find you and bite you."

They made the decision before they took one step into the house that they were going to use that dog, not as

a locating tool, they were going to use that trained police dog to apprehend, bite and hold.

Jorgensen can be heard on the audio threatening John two more times, yelling, that the dog will find you and bite you.

At the 22:56 mark Jorgensen yelled to John, "You're under arrest."

At that point, Defendant Adams -- Your Honor, as we've stated earlier, the whole purpose of the visit to John's home had changed from welfare check to making an arrest. John had -- but yet, still John had committed no serious crime that would justify an arrest. There were no exigent circumstances that were justified forcing entry into his home.

There were no allegations still that John had threatened anyone in his apartment building or elsewhere.

There were no allegations that John had threatened the safety of anyone. There were no apparent threat to any police officer.

And should the officers claim that they broke down John's door and threatened John with arrest based upon a warrant for his arrest, and threatened John with the dog, that the dog will find you and the police dog will bite you, because he, John, might have been a victim of a violent crime, or was experiencing a medical emergency?

We believe, Your Honor, that the record evidence that -- given the record evidence, a reasonable jury reviewing the totality of the circumstances, and this record evidence could find such an excuse as pure fabrication, unbelievable.

Recall, at about the seven-minute mark of the body cam, Christensen, over the radio, he wanted to force entry. But Adams told him to sit tight. "I'm coming."

In fact, it wasn't until 23:03-minute mark that the canine officer asked for two cover officers. And then the police entered the apartment and began the search of John's home.

A reasonable jury, Your Honor, could conclude that the officers waited for at least 16 minutes before entering John's home does not show that the officers truly believed that this was a life or death medical emergency, or that John was experiencing a life-threatening situation, or any medical emergency that could justify the forced entry and search of John's home.

THE COURT: And I'll need you to, in the next 5 to 7 minutes, sum up, please.

MR. BEHRENBRINKER: All right.

The officers completed their search of John's one-bedroom fairly quickly.

At 24:27, Your Honor, mark the dog alerted to the

closed door of John's bedroom. John had retreated to his bedroom closet.

Based on the totality of the circumstance in the record evidence, Your Honor, a reasonable jury could conclude that John was terrified of the officer's threats. John was terrified of the barking police dog. John was terrified of the Defendants' repeated threats that he was under arrest. And he was terrified by the repeated threats that the dog was going to bite him. So John went to the farthest point away in his house to protect himself.

As required when reviewed in a light most favorable to the Plaintiff, the record evidence presented by the Plaintiff could lead a reasonable jury to this conclusion.

The closet in John's house was 7.5 feet in length.

There was no way that John could get out of the closet, much less out of the home.

Now, up to that point, Your Honor, we contended in our brief that the facts are pretty much undisputable -- or undisputed or indisputable given our version of the events.

As for contested facts the Plaintiff's version of the facts control in summary judgment.

After locating John in the closet, Jorgensen slid open the door two or three feet, far enough to be able to peer in. The closet was in full of John's clothes hanging

on a rack, loose clothing, and laundry baskets and storage containers on the floor. John was sitting on a box on the floor at the back of the closet.

At 24:29, Jorgensen yelled, "I got contact." Meaning Jorgensen saw John.

One second later, 23 -- 24:30, Jorgensen yelled, "John, come out with your hands up, you are under arrest."

Almost immediately Jorgensen sent in the police dog. Because at 24:33, two seconds -- three seconds after he said, "You're under arrest." Jorgensen announced, "The dog's on." That's a quote. "The dog's on." Meaning the police dog was biting John.

When Jorgensen sent in the police dog, John was not actively resisting officers. He was sitting passively in his closet.

He suffered ten puncture wounds, deep enough to expose the patella bone, with tendons, ligaments and fascia. That's not in dispute, that's in the pathology report.

John's only sin, Your Honor, was that he repeatedly told the officers that he was okay. That he was fine. And that he did not consent to them coming into his home.

John's sin was that he didn't do what the officers told him to do, open the door.

According to the Chief Mathwig, John's failure to

do what he was told is not active resistance. He admitted, the Chief admitted that it could be considered under these facts passive resistance.

The important timeline here, Your Honor, is that at 24:33 mark, John is -- that Jorgensen announced, "The dog is -- dog on. The dog is on." The dog is biting on John's leg, 24:33.

At the 24:39 mark Jorgensen says, "Let go of that knife." The dog had been biting John's leg for a total of at least 6 or 7 seconds before the police alleged that he pulled out a knife.

Two seconds later, 24:41. There's -- on the video -- audio, rather, one dog yelped, sounds from the dog. Two seconds later, two seconds, 24:43, Jorgensen and Eckert shot and killed John as he sat in the closet.

At 24 -- excuse me, at 24:44, Jorgensen yelled to the dog, "Stop. Stop."

John was killed by Jorgensen and Eckert, Your Honor, at 24:43, before Jorgensen commanded the dog to stop.

The experts that have reviewed this case have all concluded that a reasonable -- that in their -- based upon their work in this case, that the Defendants shot and killed John in order to defend or in defense of a police dog.

Heyen is a police canine -- was a former police canine, full-time. He's trained over 500 police dogs. He's

developed department policies for the deployment of canine. He is a full-time field training officer and a tactical team.

He concluded that before being bit by the dog John was not actively resisting or attempting to evade. And he said -- he concluded that the Defendants knew beyond a doubt that John had committed no crime, nor was he a suspect of having committed any type of a violent crime prior to the forceful entry of their home.

He concluded sending the police dog on a hold and bite to inflict the serious wounds and permanent injury was far more force than would be reasonably necessary.

Concerning our supervisory claim, Heyen --

THE COURT: And you need to conclude, please.

MR. BEHRENBRINKER: Okay. I'm sorry, Your Honor.

Based upon, I'll rely upon our memorandum --

THE COURT: All right.

MR. BEHRENBRINKER: -- our exhibits and our affidavits that were presented in support of our opposition.

And we respectfully request that the Court deny Defendants' motion in all respects.

Thank you very much, Your Honor.

THE COURT: I'll have rebuttal. And I'll likely give you one minute last word, but most lawyers don't turn

it down.

MR. COLLINS: I'll try to keep it quick, Your Honor.

Just a couple of things I want to touch on, Your Honor. A couple of misrepresentations of fact and law that was cited by Plaintiff's Counsel.

First, with regard to there was -- he made the -- the speculation that there's no evidence, or that the Plaintiffs do not agree that Mr. Birkeland turned towards the officers with the knife in his hand is absolutely false, Your Honor.

The Plaintiff's own experts do not dispute that -- that Mr. Birkeland was facing the closed closet door and that the dog bit the right side of his -- his leg.

And, therefore, and he had to have turned towards the officers in order to be shot in the chest.

His right side was facing Officer Jorgensen and Eckert and, therefore, in order to be shot in the chest, it had to be -- he had to have turned.

So that's not an issue of fact, Your Honor, at all.

Also, if you take a look at their -- their expert reports, they don't dispute that he moved towards the officers with a knife in his hand. They just offer an explanation, which we -- which we already discussed, Your

Honor, the pulling of the dog, which has no factual basis for it, whatsoever.

The -- again, he mentions Burwell's opinion that -- that we have to assume that the dog was continually biting because the dog continually barks unless he's biting. Well, Your Honor, again, I invite you to take a look at the -- listen to the video -- see the video, listen to the audio. The dog does not bark the entire time.

And they've presented no evidence that other than pure speculation that the dog was continuing to bite Mr. Birkeland at the time shots were being fired.

Plaintiff's Counsel mentions Chief Mathwig's testimony that the officers would not have violated any policy if they would have left.

Well, that is a half-truth, Your Honor.

What Officer -- excuse me, Chief Mathwig said was the officers would not have violated any policy if they would have left and they would not have violated any policy if they stayed.

Your Honor, you hit the nail right on the head that, however the officers -- the officers, if they would have left, they could have been in a position that they wouldn't have known if someone else was in there. And, therefore, it was incumbent upon them, we want officers to make sure people are okay.

And that is consistent with the misrepresentation of the law for what Plaintiff's Counsel misrepresented the law on what a community caretaker, the -- the reasonable -- it's the reasonable belief standard. Not a reasonableness such as what you look at for Fourth Amendment violations, it's a much lesser standard. All it has to be is within the realm of belief, which because we want our officers to make sure people are okay.

He also -- Plaintiff's Counsel also made the conclusion or made the statement that Officer Christensen and Vang concluded that there was only one person in the apartment while they were outside. That's absolutely false, Your Honor.

What they said was, they concluded they only heard one voice from inside the apartment. Much different than -- and they repeatedly said that in their depositions, much different than concluding that there was only one person in the apartment. They came -- they came to that conclusion after the apartment was cleared, but they had no idea at that time that the -- standing outside the apartment.

Also this continuous mention of the warrant, Your Honor.

The undisputed facts are -- the mention of a warrant was -- the first time it was mentioned was after the door was breached.

It was never mentioned before the breach. The officers entered the apartment on a community caretaker function.

They used the mention of a warrant in order to get people to hopefully come to them instead of forcing the issue. They're trying to deescalate the situation by having people come to them.

What -- again, Your Honor, you also hit the nail on the head when you asked him, well, what about him mentioning, you know, I've been robbed again.

Well, as that -- obviously any reasonable officer with CIT training would know that, okay, we might have a victim of a violent crime here, we should probably stick around and check it out.

It completely forgets -- doesn't mention that in his presentation.

He also throughout the brief, Your Honor, the Plaintiff fails to mention, they don't dispute, that after, while in the closet, while Mr. Birkeland was in the closet, Officer Jorgensen tells him, repeatedly, Come out of the closet, you're under arrest. Come out with your hands up.

After he said that, there is no dispute that John reached down, grabbed a butcher knife in response. And that's when Officer Jorgensen let Otis go.

Then you hear the yelp, because the yelp was Mr.

Birkeland using the butcher knife and stabbing Otis with it.

So it wasn't just, I have contact, he sent the dog in. There's a reason why he sent the dog in.

And then he slightly mentioned this, Your Honor, that they believe that the officer -- the officers shot Mr. Birkeland in defense of a dog, there's absolutely no evidence to support that.

And as the case law is specific on, Your Honor, that the intent of an officer does not come into the analysis of a Fourth Amendment reasonableness analysis.

And more importantly, Your Honor, and this will be the final thing that I'll mention. You didn't hear them once dispute that John had a butcher knife with him in the closet at the time.

You didn't hear them once dispute that right in front of Officer Jorgensen, who was less than 7.5 inches away, he used that knife to stab a police dog in front of him.

You didn't hear him dispute that Officer Jorgensen repeatedly told him to drop the knife. And he continued and he refused to.

Instead he turned toward, and came toward the officers, despite these repeated requests, orders to drop the knife.

And you can hear that plain as day on the audio of the -- of Officer Christensen's body camera.

And so those are the undisputed facts. And they don't dispute them.

And based on those undisputed facts and the facts in the case law that we cited, Your Honor, which there is no case law that prohibited the officers from using deadly force under this scenario, the -- therefore, they did not violate any clearly-established law and they're entitled to qualified immunity. Thank you.

THE COURT: Thank you.

MR. COLLINS: Thank you, Your Honor.

THE COURT: Would you like the last word briefly?

MR. BEHRENBRINKER: Very briefly, Your Honor.

THE COURT: Most lawyers don't turn it down.

MR. BEHRENBRINKER: No, can't do that. Thank you, very much, Your Honor. I appreciate the opportunity.

Concerning the community caretaker function the standard, United States Court of Appeals for the Eighth Circuit, and I believe it's *U.S. versus Quezada*, and it's Q-U-E-Z-A-D-A, in 2006, 844 --

THE COURT: Yeah. I've got it here in this stack.

MR. BEHRENBRINKER: Okay. The Court there held that, "An officer acting in a community caretaking role may

enter -- may only enter a residence when the officer has a reasonable belief that an emergency exists that requires attention."

Reasonable belief is, I submit to you, Your Honor, courts have interpreted that to mean probable cause or very similar to the term probable cause.

And for all of the reasons that we've set forth in our -- in our brief and in our experts, there was not probable cause.

There was not a reasonable belief for a reasonably objective police officer to conclude that based on the totality of the circumstances presented that there was an emergency here.

One of the things that we also -- that Counsel referred to as a red herring in their brief and we discussed is the concept the *Wick* defense, or under Minnesota law, self-defense.

We believe that the -- the totality of the circumstances is the record evidence that we provided shows that the using a of a police dog, a specifically-trained attack dog in this circumstance, because they were using the dog as an offensive weapon, not as a locating tool, but they used him to apprehend, bite and hold. That's an offensive weapon.

Under the facts and circumstances presented here,

what was known to the officers at the time, a reasonable jury could conclude that was objectively unreasonable or excessive force.

Under the *Wick* Defense, Minnesota law, Mr. -- Mr. Birkeland, excuse me, had a right to defend himself against this excessive force.

He has -- and this Court, the District Court for the District of Minnesota has used or applied that in, when -- I believe it's stated that, "When a police officer initiates excessive force, an individual has a right to resist the excessive force when the officer is the initiator."

In this case, that's what exactly what the officers were doing when they sent that dog in almost simultaneously with seeing John in the closet.

They hadn't seen a knife. They had no indication there was a knife. John had a right to defend himself.

Several times he talks about the injury to the dog. We've raised in our brief, the dog -- they couldn't even identify an injury on the dog after examining him several times.

It wasn't until a few hours later or a good hour or more later that they took him -- that they took the dog to the University of Minnesota.

At that point they found a very minor,

nonlife-threatening injury to -- under the jaw area.

He didn't stab him in the neck with a butcher knife, it was a kitchen knife. I'm not trying to deminimize that, but the purpose of me bringing this up, is that at the scene there was no indication that the dog had been injured. Initially at the Police Department there was no indication.

It wasn't until much later after they're talking about this and everything then Jorgensen finds the injury.

As far as BCA lab, there was no -- it's not inconclusive. There was no dog blood on that knife. The only blood on that knife was John's.

And there were the BCA reports, which we've included as part of our exhibits, there were no identifiable fingerprints of John Birkeland on that knife. That's -- those are not disputed. They are scientific, forensic evidence.

The only other point I would raise is that --

Well, I'm going to leave it at that. Thank you very much, Your Honor.

THE COURT: All right. I'll deem -- thank you each for your arguments.

I'll deem the matter submitted. I'll have a couple of comments here.

And, obviously, not unique to this case, but extremely important, in cases, especially a case like this,

both parties have asked me to review or rereview certain key facts in the records you both submitted, and that's clearly my responsibility.

I will deem the matter submitted, take it under advisement. A couple things, not unique to this case procedurally.

We have a trial ready date of April 15th.

Obviously if the -- the Court grants the Defense motions, that would be not necessary.

On the other hand, I think it's always fair to all lawyers in all cases, and their clients to get the decision of the Court so you don't have to start preparing for a trial before you know, one, is there going to be a trial? And, two, what is going be the issues?

So sometimes what I do, depending upon the circumstances, unless Counsel here asks me not to, I -- in other words, as the lawyers in the room know, you're entitled to, everybody's entitled to what we commonly call a memorandum, opinion saying, Here's my decision, here's my analysis, here's the result. Because I think everyone, especially clients on all sides of a case, have a right to know just not what the decision is but what -- how did the Judge get there?

So sometimes what I'll do, frankly speaking, sometimes lawyers will say, well, we'd rather not do it that

way.

Sometimes, for example, for timing purposes, let's say my decision comes out in the next 45 to 60 days. Sometimes, if I -- Counsel agrees, not as a substitute for a full analysis of the case, but the Court will send a short e-mail to the parties saying, my opinion's coming out on this date, here's my decision.

Sometimes lawyers say, well, we'd rather get your decision with your reasoning, not just -- excuse me, without knowing how you got there, what it was, and so I'll probably ask that quick question because I'd be willing to do that here.

Frankly speaking, in a majority of cases, people say, well, as long as we can space things properly and get the decision and have input into a trial date, we'd rather just get your decision first and then decide if that's necessary. And if there's going to be a trial, because then we can agree on a date.

So without complicating things, does the Plaintiff have a strong view on that in terms of whether you'd like to hear a couple weeks before you get my decision?

I'll just promise to you that your case doesn't get delayed, but we'd come up with a date. Because I -- because we time it so there's a trial date, a pretrial, and then a -- and then with -- no matter what my decision is,

whether there's granting the motion in full, or granting the motion in part of the Defense.

So let's say some piece of it remains, then we also reach out, as most lawyers know, to set up, separate from the pretrial with me, for pretrial, a settlement conference with the magistrate judge.

And one or all parties may be saying, the time for talk is over. We want the judge's decision, let's get on for it one way or the other.

So in that context, before we adjourn, I guess the one -- the only question I have is the -- because I think what I'm telegraphing is, I'll work with you on a date. You shouldn't have to leave here thinking, does the Judge, no matter when we get the opinion, and find out if we're going to have a trial, are we locked into April 15th?

Or would we like -- we'd like to get -- we'll take his decision even before the opinion comes out. Does the Plaintiff have a view on that?

MR. BEHRENBRINKER: Whatever pleases the Court. But we will love the opportunity to be able to work with the Court on scheduling.

THE COURT: What about getting the decision before a few weeks?

MR. BEHRENBRINKER: That would be fine.

THE COURT: Defense have a view?

MR. COLLINS: Your Honor, we would rather have the memo.

THE COURT: Okay.

MR. COLLINS: And not an e-mail. We -- obviously we're dealing with qualified immunity.

THE COURT: Yes, you are.

MR. COLLINS: We have a right to interlocutory appeal.

THE COURT: Okay.

MR. COLLINS: If the Court decides to deny the motion.

THE COURT: All right. Well, let's do this, I think, kind of in fairness to everyone.

What I'll do is this:

I -- we will send you, not my decision, we'll send you, in the next week to 10 days, here's when you'll get my opinion.

In other words, so you can -- in terms of, well, the Judge has said no longer than 60 days, well, what's it going to be?

We'll send an e-mail to Counsel saying, here's when the opinion will arrive. That's different than saying here's my decision, you have to wait.

So we'll do that and then I promise to work with Counsel. And I also promise you that if the case isn't

resolved by this motion that -- in other words, one of my criticisms of many courts, and that's true when I was a state judge many years ago, was sending a notice to lawyers saying you're number 17 for such and such a date, as opposed to a date certain.

And so I'll send out an e-mail, not unique to this case.

I'll just leave you with this, obviously I'm aware of no matter what my decision is, it's a very difficult case for everybody on the case, on all sides no matter how strong people feel.

And so we'll do our best to treat it as a priority, give it careful scrutiny. But that doesn't mean we're not aware of how important this is to all sides in the case, on all sides of the case.

So with that, not to send any negative waves, but I think it's going to get colder out the next couple of days. So, thank you for the argument.

For the folks waiting for the next case, I'm going to give my court reporter 15 minutes then we'll roll into the next argument.

And we adjourned. And stay warm and stay safe. All right. Thank you.

MR. COLLINS: Thank you, Your Honor.

MR. BEHRENBRINKER: Thank you.

(Court adjourned.)

**REPORTER'S CERTIFICATE**

I, Lynne M. Krenz, do certify the foregoing pages of typewritten material constitute a full, true and correct transcript of my original stenograph notes, as they purport to contain, of the proceedings reported by me at the time and place hereinbefore mentioned.

/s/Lynne M. Krenz
Lynne M. Krenz, RMR, CRR, CRC